This is an interlocutory appeal, pursuant to Rule 5(a), Ala.R.App.P., from the denial of the defendants' motions for a summary judgment. The trial court provided this Court a statement of two "controlling questions of law": 1) Whether the plaintiff Pamela Holberg's divorce judgment creates a "contractual" or "business" relationship that will support her claim alleging intentional interference with a business or contractual relationship; and 2) Whether the plaintiff can state a claim for money damages for conspiracy to fraudulently transfer property. We reverse the order *Page 114 
denying the defendants' summary judgment motions.
Pamela Holberg and William Cagle were married on March 26, 1993, and were divorced on October 7, 1993. The divorce judgment ordered Cagle to pay Holberg, as alimony in gross, the amount of $960,000, payable monthly, at the rate of $4,000 per month, beginning November 1, 1993. The judgment of divorce also provided:
 "Mr. Cagle covenants and agrees that he shall not take any action with respect to his estate as it now presently exists which would cause any real property or partnership interests now owned by him to pass outside his probate estate, nor shall he acquire title to any property in the future with right of survivorship or other method which would have the same or similar result as to such future-acquired property. The preceding sentence shall not be construed so as to prohibit the transfer of any property in an [arm's-length] sale of any such property for adequate consideration."
The divorce judgment also obligated Cagle to maintain a $100,000 life insurance policy, with Holberg as the beneficiary.
On August 12, 1995, Cagle married Regina Wrigley. On October 25, 1995, Cagle suffered a bilateral stroke, which caused him to lose the use of his arms and legs and, eventually, to lose his ability to eat. Cagle was one of three partners in Folmar 
Associates ("Folmar"), a real-estate-development firm. Before he married Holberg, Cagle had begun taking "draws" or "cash-advance" loans from Folmar against his ownership interest in the partnership. These draws or advances were to be repaid by deductions from Cagle's interest in the partnership's future earnings. At the time of Cagle's stroke, he owed Folmar more than his interest in the partnership was worth; he had three unsecured loans payable to AmSouth Bank; and he had credit-card debt of approximately $100,000, all in addition to his financial obligations to Holberg. Furthermore, Cagle had allowed his life insurance policy to lapse and, after his stroke, his financial advisors could find no company that would insure him.
In late 1995 or early 1996, Cagle and his wife Regina met with Jimmy Folmar, one of Cagle's partners; Harold Parkman, the attorney for the partnership; and John Gill, an independent C.P.A. adviser for the partnership. On January 22, 1996, Cagle, who was not able to sign his name, marked an "X" on a durable power of attorney prepared by Parkman in favor of Regina. The Cagles hired Michael Strojny, an agent of the Strojny Corporation (hereinafter referred to collectively as "Strojny"), as a financial adviser in January or February 1996. Cagle was generating $7,000 to $10,000 per month in uninsured costs for round-the-clock nursing care, supplies, and medications. Folmar began advancing the Cagles $20,000 per month for Cagle's living expenses. Folmar also advanced other amounts of money for the Cagles to pay credit-card indebtedness, to purchase a car, and to use for other purposes. Regina Cagle used some of the money to take vacations and to pay for cosmetic surgery.
In March 1997, Folmar, after consulting with Regina Cagle and Strojny, decided to reduce the monthly advance to $11,000 per month. The first reduced payment was made in May 1997. At that point, Cagle stopped making alimony payments to Holberg. Cagle died on September 25, 1997. Between October 1995 and September 1997, Folmar had advanced $779,641.05 to the Cagles, in the form of advances against Cagle's partnership interest. Folmar recovered all of the funds it had furnished Regina by offsetting the advances against Cagle's future draws on his partnership interest. Cagle's estate was declared insolvent.
Holberg sued Regina Cagle, alleging intentional infliction of emotional distress, interference with a business relationship, fraudulent transfers, breach of fiduciary duty, self-dealing, and conspiracy. Holberg later amended her complaint to add *Page 115 
Folmar, the Strojny Corporation, and Michael A. Strojny, making the same claims against them. The trial court granted the defendants' motion to dismiss Holberg's claim alleging intentional infliction of emotional distress. The trial court denied the defendants' motions for summary judgment as to the remaining claims. This Court granted Folmar and Strojny permission to appeal the denial of the motions for summary judgment, pursuant to Rule 5(a), Ala.R.App.P.
 I.
The first "controlling question of law" stated by the trial court involves Holberg's claim alleging intentional interference with a business relationship. In Gross v. Lowder Realty Better Homes Gardens, 494 So.2d 590 (Ala. 1986), this Court announced a new rule that was broad enough to encompass both interference with business relations and interference with contractual relations. The tort of intentional interference with business or contractual relations requires:
"(1) The existence of a contract or business relation;
"(2) Defendant's knowledge of the contract or business relation;
 "(3) Intentional interference by the defendant with the contract or business relation;
 "(4) Absence of justification for the defendant's interference; and
 "(5) Damage to the plaintiff as a result of defendant's interference."
Gross, 494 So.2d at 597. The defendants argue that the first element is not satisfied because, they contend, there is no contract or business relationship with which they could have interfered.
Holberg contends that this Court has impliedly held that a judgment of divorce is a contract that can be the subject of a claim alleging intentional interference, citing Braswell v.Braswell, 574 So.2d 790 (Ala. 1991). In that case, a settlement agreement, which was incorporated into a final judgment of divorce, provided that if the husband "sold" certain shares of stock in Patterson Wilder Construction Company, Inc., within five years of the agreement, the wife was entitled to receive 1/2 of the proceeds. The husband exchanged the Patterson Wilder stock for stock in D.C. Braswell Construction Company, Inc. The parties disagreed over whether the "exchange" of stock constituted a "sale." Among the claims the wife asserted against the husband was a claim of intentional interference with a business relationship. The trial court entered a partial summary judgment in favor of the wife, holding that the term "sale" encompassed the exchange of the stock. The trial court "struck" the other portions of the wife's complaint.
In Braswell, this Court upheld the trial court's holding that the term "sale" encompassed the exchange of stock. This Court then remanded the case for a trial on the merits of the wife's remaining claims, including the claim alleging intentional interference, stating that those claims were "ripe for consideration by the trial court." 574 So.2d at 794. Holberg contends that because in Braswell this Court remanded the intentional-interference claim, a judgment of divorce must constitute a contract upon which one can base an intentional-interference claim. We disagree. This Court specifically stated in Braswell that the intentional-interference cause of action "could have accrued only after May 25, 1988, which is the date the trial court determined that Cay Braswell became a stockholder in D.C. Braswell Construction Company, Inc." 574 So.2d at 794. Thus, the intentional-interference claim was premised on the creation of a business relationship — the wife's ownership of stock in the company — rather than on the judgment of divorce.
Holberg also cites Rabun v. Kimberly-Clark Corp.,678 F.2d 1053 (11th Cir. 1982). In that case, the United States Court of Appeals for the Eleventh Circuit, concluding that a debtor-creditor relationship is a *Page 116 
contractual relationship under Georgia law, held that an intentional-interference claim may be asserted against one who incites a creditor to repossess equipment leased to the debtor. In that case, Rabun alleged that an employee of Kimberly-Clark had falsely told one of Rabun's creditors that Rabun had fled the state, with the intended consequence that the creditor would repossess the farm equipment Rabun had obtained on a rental-purchase basis from that creditor. We do not find the holding in Rabun applicable to this case. The debtor-creditor relationship in Rabun is distinguishable from the debtor-creditor relationship created by a judgment.
Alabama courts have previously held that a judgment is not a contract in the strict sense of the word. Knight v. Knight,409 So.2d 432 (Ala.Civ.App. 1982). Specifically in the context of a judgment of divorce, this Court has stated:
 "If there is an agreement between the parties and it is not merged or superseded by the judgment of the court, it remains a contract between the parties and may be enforced as any other contract. However, any part of the agreement that is merged into the judgment is subject to the equity power of the court and is no longer of a contractual nature."
Killen v. Akin, 519 So.2d 926, 930 (Ala. 1988).
In Knight, the Court of Civil Appeals determined that a judgment of divorce falls within the class of judgments ex delicto
rather than ex contractu. In that case, the wife had pursued a garnishment pursuant to § 6-6-481, Ala. Code 1975, which permits a writ of garnishment only after a final judgment ex contractu. The Court of Civil Appeals determined that a judgment of divorce is not an ex contractu judgment, quoting Lasseter v. Lasseter,266 Ala. 459, 461, 97 So.2d 555, 557 (1957): "A decree for alimony and attorney's fees is not a `debt contracted' within the meaning of our Constitution and statutes and `as related to exemptions, the demand is in tort and not ex contractu.'" (Citations omitted.)
This Court has never held that a judgment of divorce could be the subject of a claim of intentional interference with a contract or business relationship. In fact, that cause of action is based on the theory that "an unlawful invasion of or interference with the pursuit or progress of one's trade, profession, or business is a wrong for which an action lies." Sparks v. McCreary, 156 Ala. 382,387, 47 So. 332, 334 (1908). When that cause of action was expanded by this Court in Gross, the Court stated that the general rule against interference with contracts or business relations "has been brought about by the recognition that rights of a party to a contract or business relation are of paramount importance in the business community and should be protected from unjustified interference by third persons." 494 So.2d at 596.
We decline to extend the cause of action for intentional interference with a contract or business relationship to reach claims of interference with a judgment of divorce. Judgments are enforceable through the courts, and other remedies are provided for circumstances in which the judgment debtor fails to satisfy the judgment. For example, § 10-8-42 and § 10-9B-703, Ala. Code 1975, provide that, on due application by the judgment creditor of a partner, the court may charge the interest of the debtor partner with payment of the unsatisfied amount of the judgment debt, with interest. Therefore, we conclude that Holberg's divorce judgment does not constitute a contractual or business relationship that will support a claim of intentional interference, under Alabama law. The trial court erred in denying the defendants' motions for summary judgment on the intentional-interference claim.
 II.
The second "controlling question of law" stated by the trial court is whether *Page 117 
Holberg can maintain a claim for money damages under Alabama law pursuant to a theory of conspiracy to fraudulently transfer. Before we address that issue, we must consider whether Holberg can maintain any claim against these defendants for conspiracy to commit fraudulent transfers. The Alabama Uniform Fraudulent Transfer Act, codified at Ala. Code 1975, §§ 8-9A-1 to -12, provides that "certain transfers are void or voidable if they are made to the detriment of a creditor." Russell v. Russell, 758 So.2d 533,538 (Ala. 1999). The plain language of the statutes applies only to conveyances "made by a debtor." See §§ 8-9A-4 and -5. "Debtor" is defined as "[a] person who is liable on a claim." § 8-9A-1(6). The defendants contend that Holberg cannot maintain a claim under the statute because, they say, neither Folmar nor Strojny is Holberg's "debtor." Rather, the defendants contend, Holberg's claim under the fraudulent-transfer statute lies against Cagle's estate.
Holberg argues that this Court should give the fraudulent-transfer statute a liberal construction and apply it to her claims against the defendants. She quotes Taylor v. Peoples FertilizerCo., 270 Ala. 243, 254, 117 So.2d 180, 191 (1959), for the proposition that "[t]his [C]ourt has held that transactions to defeat creditors are viewed . . . with disfavor and the statute therefore should receive a liberal construction." However, that case involved a conveyance of property by the debtor. A liberal construction of the fraudulent-transfer statute does not require a holding that the statute applies to transfers made by someone other than the debtor. Additionally, the Court of Civil Appeals has stated:
 "Although the fraudulent conveyance statute is given a liberal construction, see Jesse P. Evans, Alabama Property Rights and Remedies, § 31.1, 470 (1994), and `[t]he manner or form of the transfer or conveyance is generally immaterial so long as the debtor, through a fraudulent device, puts his or her property beyond the ordinary reach of the creditor,' id. at § 31.2, 473, every conveyance that frustrates a creditor is not a fraudulent conveyance under the statute."
Aucoin v. Aucoin, 727 So.2d 824, 827 (Ala.Civ.App. 1998). Even a liberal construction of the statute requires some demonstration that the debtor has put his property beyond the reach of a creditor.
Holberg has cited no cases in which someone other than the debtor has been held liable under the fraudulent-transfer statute. Holberg simply argues that her claims should be valid under the statute because, she argues, Folmar was fraudulently transferring Cagle's assets to Regina; Regina was acting on behalf of Cagle when she used the power of attorney to transfer his assets into her name; and Strojny was "concocting schemes for Regina to fraudulently put Cagle's assets into her name." However, Holberg's claims are missing one essential element for a cause of action pursuant to the Alabama Uniform Fraudulent Transfer Act: The transfer of property by the debtor.
The purpose of the Alabama Uniform Fraudulent Transfer Act is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach. The plain language of the statute makes it applicable only to transfers "made by a debtor." In previous cases involving statutory interpretation, this Court has stated:
 "`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Blue Cross Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala. 1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp.,602 So.2d 344, *Page 118 
346 (Ala. 1992). This Court has also stated:
 "It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers."
DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270,276 (Ala. 1998).
We have found no case in which the provisions of the Alabama Uniform Fraudulent Transfer Act, §§ 8-9A-1 to -12, have been extended to apply to transferors other than the debtor. Holberg argues that the defendants were in control of the debtor's assets and, therefore, should be held liable. Holberg also argues that — because the judgment debtor is deceased, the defendants have rendered his estate insolvent, and the wife of the debtor is bankrupt — this Court should permit her to hold the defendants liable under the fraudulent-conveyance statute. Even if we accepted Holberg's argument that Folmar and Strojny engaged in a conspiracy to defraud her, the Alabama Uniform Fraudulent Transfer Act, by its plain language, does not apply to claims against third-party transferors. Holberg's claim under that Act should have been asserted against the debtor (Cagle) or his estate. While there may be valid policy arguments for extending the Act to apply to transferors who are in control of the debtor's assets, "it is not for the Judiciary to impose its view on the Legislature." Ex parte T.B., 698 So.2d 127, 130 (Ala. 1997). Therefore, we conclude that the trial court erred in denying the defendants' motions for a summary judgment on the fraudulent-conveyance claims. Our resolution of this issue makes it unnecessary to address the question whether a plaintiff can recover money damages pursuant to the Alabama Uniform Fraudulent Transfer Act, or whether remedies under that Act are limited to recovering the fraudulently transferred property.
The trial court should have granted the defendants' motions for a summary judgment. The order denying those motions is reversed, and the cause is remanded.
REVERSED AND REMANDED.
Maddox, Houston, Cook, See, Lyons, Brown, and England, JJ., concur.