MADDOX, Retired Justice.
This case involves an alleged fraudulent transfer of property; the issue presented is whether the grantor, the receiver of an insolvent insurance company who transferred property of the receivership as authorized by a court order, was a “debtor” within the meaning of that term under the provisions of the Alabama Uniform Fraudulent Transfer Act (“AUFTA”), §§ 8-9A-1 to -12, Ala.Code 1975.
On January 6, 1999, S.J. Holding, Inc., sued Kadco, Inc., the grantee of the alleged fraudulent transfer of real property. S.J. Holding sought an avoidance of the transfer and compensatory and punitive damages. Kadco answered the complaint and counterclaimed, alleging intentional interference with contractual and business relations, slander of title, and conspiracy to commit the foregoing torts.[1]
*1037 Thereafter, S.J. Holding moved for a summary judgment on Kadco’s counterclaims; it subsequently moved for a summary judgment on its claim against Kadco. In reply, Kadco moved for a summary judgment on the fraudulent-transfer claim asserted against it.
On March 20, 2002, the trial court, based on the undisputed material facts submitted in support of and in opposition to Kadco’s motion for a summary judgment, granted the motion. S.J. Holding appeals; it argues that the trial court erred in holding that the receiver, as the grantor, was not a “debtor,” within the meaning of the provisions of the AUFTA. S.J. Holding also argues that the trial court erred when it found that the sale was a judicial sale, but because we find that the trial court did not err in determining that the receiver/grant- or was not a debtor, we’ need not decide this issue. We affirm.

Facts and Procedural History

On September 22, 1992, the Jefferson Circuit Court, in a case styled State of Alabama ex rel. Mike Weaver, as Commissioner of Insurance, and Nelson Burnett, as Chief of the Insurance Department’s Receivership Division v. Employers Insurance Company of Alabama, Inc., CV-92-07556, found that Employers Insurance Company of Alabama, Inc. (“EICA”), was insolvent, and in its order appointed Nelson Burnett, chief of the recéivership division of the State Department of Insurance, as the receiver for the insolvent insurer pursuant to § 27-2-53, Ala.Code 1975.[2] One of EICA’s assets was over 90% of the stock of South Jefferson Company, Inc. (“South Jefferson”), which owned a tract of real property called Meadowbrook Townhome Property (“the Meadowbrook property”), *1038 which is the subject of this appeal. In July 1985, South Jefferson borrowed $1,500,000 from AmSouth Bank to develop the Meadowbrook property. To secure the loan, South Jefferson granted AmSouth a first mortgage on the property-
At the time Burnett was appointed receiver of EICA, John P. Baker was president of South Jefferson.[3] In November 1992, Baker and S.J. Holding, of which Baker was the sole shareholder, executed a security agreement with AmSouth pursuant to which Baker and S.J. Holding personally guaranteed the indebtedness of South Jefferson. The agreement also created a lien on additional property owned by S.J. Holding and provided that in the event of South Jefferson’s default Am-South could apply proceeds from the sales of various lots owned by S.J. Holding to the indebtedness of South Jefferson.
There is evidence in the record indicating that Burnett, as the receiver of EICA, was duly elected chairman of the board and president of South Jefferson in December 1992, but that Burnett was never appointed the receiver for South Jefferson, nor was South Jefferson in the insurance business. EICA was merely the majority stockholder of South Jefferson.[4]
In early 1993, South Jefferson defaulted on its mortgage payments on the Meadow-brook property, and as authorized by the security agreement executed by Baker and S.J. Holding, AmSouth Bank applied funds from the lots sold by S.J. Holding to South Jefferson’s mortgage on the Meadowbrook property. The total amount of funds withheld from S.J. Holding and applied to South Jefferson’s indebtedness was $147,132.
In 1995, Kadco expressed an interest in buying the Meadowbrook property, and on August 8, 1995, Burnett, as the receiver for EICA, filed a motion in the Jefferson Circuit Court in the State ex rel. Weaver v. EICA case for the approval of a sale of the Meadowbrook property to Kadco. In his motion Burnett stated that as the receiver of EICA he was petitioning the court to approve the sale of property, “currently owned by South Jefferson, a subsidiary of EICA.” In his motion Burnett stated that EICA owned over 90% of South Jefferson; that South Jefferson held only two substantial assets, the Meadowbrook property and a parcel of real property located in Georgia; that the Meadowbrook property was mortgaged to AmSouth Bank and the balance of the loan secured by the mortgage was $576,405.32; that the value of the Meadowbrook property was considerably less than the outstanding balance of the loan; that an appraisal of the Meadow-brook property estimated the market value of the property to be $310,000; that Kadco had agreed to purchase the Meadowbrook property for $300,000; and that the proceeds from the sale would be applied to the loan, leaving AmSouth with a claim of $276,405 against South Jefferson. Burnett further alleged that AmSouth had agreed to take a nonrecourse mortgage on the property in Georgia to satisfy the mortgage on the Meadowbrook property. Burnett’s motion also stated:
“The only other significant creditor of South Jefferson is EICA. This debt to-talled $369,312.42 as of December 31, 1994. To the best of the Receiver’s knowledge, this liability to EICA was created through ‘intercompany loans’ from EICA to South Jefferson, all of which accrued in the calendar years 1990,1991, and 1992.
*1039 “Upon Court approval of these transactions, EICA as majority stockholder in South Jefferson, will hold a special stockholder meeting to obtain approval of these transactions.
“Accordingly, Nelson Burnett, as Receiver of EICA, represents to the Court that the sale of property and transfer of assets proposed in this motion are in the best interest of the receivership estate of EICA.”
On September 6, 1995, Burnett issued to the shareholders of South Jefferson a notice of a special meeting, to be held on September 28, 1995, at the office of the State Department of Insurance, receivership division, for the purpose of approving the sale of the Meadowbrook property to Kadco.[5] On September 20, 1995, the circuit court granted Burnett’s motion for approval of the sale of property.
Immediately upon learning of the proposed sale, Baker telephoned Burnett and objected to the sale. In addition, Baker voted against the sale at the shareholders’ meeting, but the resolution of the board of directors, approved on September 28,1995, recommended that Kadco’s offer be accepted.
Baker and S.J. Holding notified Burnett that funds from S.J. Holding were used to pay South Jefferson’s mortgage debt, but the record is unclear as to exactly when this notification took place. On October 16, 1995, Burnett, as president of South Jefferson, wrote a letter to Baker, as president of S.J. Holding.[6] In that letter Burnett stated:
“As you requested, we have checked with AmSouth regarding your impression that funds originating from S.J. Holding Company, Inc., were applied to reduce the debt owing from South Jefferson to AmSouth.... The bank, however, maintains no records indicating the source of funds that were applied to reduce the debt of South Jefferson. Accordingly, AmSouth Bank can only confirm that S.J. Holding may have reduced the debt of South Jefferson to AmSouth, but is unable to verify the amount of such debt reduction. To the extent that S.J. Holding is a valid creditor of South Jefferson, it will be incumbent upon your company to establish the proper amount of such debt, if any.
“To the extent that S.J. Holding is able to submit appropriate and accurate documentation to South Jefferson verifying the extent to which S.J. Holding is a valid creditor of South Jefferson, if such is the case, then South Jefferson will, of course, reflect the obligation on future financial statements. At present, however, despite our efforts, the existence and amount of any alleged debt from South Jefferson to S.J. Holding is unproven and therefore denied.”
On October 17, 1995, Baker, as president of S.J. Holding, wrote a letter to Burnett, as president of South Jefferson, stating that payments reducing the indebtedness of South Jefferson were made “in substan *1040 tial amounts ... to the Bank by [S.J. Holding]” and that, “[a]s a creditor of [South Jefferson], [S.J. Holding] hereby serves notice of its opposition to the [sale of the Meadowbrook property].” In a separate letter, also dated October 17, 1995, Baker wrote that S.J. Holding was a creditor of South Jefferson in the amount of $147,132.88.[7] On October 18, 1995, Burnett deeded the Meadowbrook property to Kadco. S.J. Holding was never reimbursed for the funds used to reduce the indebtedness of South Jefferson.
On January 6, 1999, S.J. Holding sued Kadco in the Shelby Circuit Court alleging that the conveyance of the Meadowbrook property was fraudulent and that, “[a]t the time of [the] transfer, S.J. Holding was a creditor of and had claims against South Jefferson, which could have been satisfied, in whole or in part, from the transfer of [the Meadowbrook] property.”
In its complaint, S.J. Holding alleged that at the time the Meadowbrook property was sold to Kadco South Jefferson was insolvent and South Jefferson did not receive equivalent value for the Meadow-brook property. Subsequently, both S.J. Holding and Kadco filed motions for a summary judgment, and on March 20, 2002, the circuit court entered a comprehensive order in which it discussed in some detail this Court’s holdings in Folmar & Associates LLP v. Holberg, 776 So.2d 112 (Ala.2000), and Thompson Properties v. Birmingham Hide & Tallow Co., 839 So.2d 629 (Ala.2002), and concluded that Kadco was entitled to a summary judgment. In its order the Court stated, in part:
“As in [Folmar & Associates LLP v.] Holberg, [776 So.2d 112 (Ala.2000),] in the present case, the plaintiff, S.J. Holding, is seeking to void a transfer made by a third party, in this case, Burnett, the receiver, not by the actual debtor, South Jefferson. Like Ms. Holberg, S.J. Holding contends that Burnett was in control of South Jefferson’s assets, including [Meadowbrook] and therefore is effectively the debtor and is liable under the [AUFTA]. While it is undisputed that Burnett was in control of South Jefferson’s assets at the time of the transfer, under Holberg, that fact is not dispositive. As the Holberg Court reasoned, ‘[w]e have found no case in which the provisions of the [AUFTA] have been extended to apply to transfer-ors other than the debtor [itself].... [B]y its plain language, [the AUFTA] does not apply to claims against third-party transferors.’ 776 So.2d at 118. Burnett was effectively a third-party transferor.”
The Court then found as follows:
“As discussed, in Thompson Properties [v. Birmingham Hide & Tallow Co., 839 So.2d 629 (Ala.2002),] the Alabama Supreme Court narrowly qualified Hol-berg such that when the debtor’s alter ego made the transfer the transfer is made by the debtor. Unlike in Thompson Properties, however, in the case at bar, the court has not found, nor has S.J. Holding even alleged, that Burnett is the alter ego of South Jefferson. Therefore the facts of the present case are more similar to those in Holberg than in Thompson Properties. As such, the Holberg holding applies to this case. The Court accordingly finds that the transfer of [Meadowbrook] from Burnett to Kadco was not made ‘by the debtor.’ Therefore, the transfer is not subject to the [AUFTA]. Consequently, as a mat *1041 ter of law, the transfer of Meadow Brook to Kadco was not fraudulent under Alabama Code sections 8-9A-5(a) or 9-9A-4(a).”

Standard of Review

In American Liberty Insurance Co. v. AmSouth Bank, 825 So.2d 786, 790 (Ala.2002), this Court stated:
“We review this case de novo, applying the oft-stated principles governing appellate review of a trial court’s grant or denial of a summary-judgment motion:
“ ‘We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.’
“Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2001) (citations omitted).”

Analysis

The trial court did not err in determining that the facts of this case are more similar to those in Holberg than those in Thompson Properties. In Holberg, this Court considered whether parties who were in control of a debtor’s assets could be considered to be the “debtor” within the meaning of the AUFTA. The debtor, William Cagle, was ordered to pay his former wife, Pamela Holberg, alimony in gross, in the amount of $960,000, payable monthly, at the rate of $4,000 per month, beginning on November .1, 1993. Cagle remarried and then suffered a stroke. Cagle was a partner in a real-estate development firm, and he began taking cash advance loans from the firm against his ownership in the firm. Because of his poor health, Cagle executed a durable power of attorney in favor of his new wife, Regina Cagle, on January 22, 1996. The couple continued to receive monthly payments from Cagle’s partnership, but Cagle quit making the alimony payments in March 1997. Cagle died on September 25, 1997, and because the total of his cash advances exceeded the value of his interest in the partnership, his estate was declared insolvent.
Holberg sued Regina Cagle; Michael Strojny, Cagle’s financial advisor; and the partnership, alleging among other things, that a conspiracy to commit fraudulent transfers had occurred. This Court, holding that Holberg could not maintain an action alleging a conspiracy to fraudulently transfer, stated:
“[W]e must consider whether Holberg can maintain any claim against these defendants for conspiracy to commit fraudulent transfers. The Alabama Uniform Fraudulent Transfer Act, codified at Ala.Code 1975, §§ 8-9A-1 to -12, provides that ‘certain transfers are void or voidable if they are made to the detriment of a creditor.’ Russell v. Russell, 758 So.2d 533, 538 (Ala.1999). The plain language of the statutes applies only to conveyances ‘made by a debtor.’ See §§ 8-9A-4 and -5. ‘Debtor’ is defined as ‘[a] person who is liable on a claim.’ § 8-9A-l(6). The defendants contend that Holberg cannot maintain a claim *1042 under the statute because, they say, neither Folmar nor Strojny is Holberg’s ‘debtor.’ Rather, the defendants contend, Holberg’s claim under the fraudulent-transfer statute lies against Cagle’s estate.
“Holberg argues that this Court should give the fraudulent-transfer statute a liberal construction and apply it to her claims against the defendants. She quotes Taylor v. Peoples Fertilizer Co., 270 Ala. 243, 254, 117 So.2d 180, 191 (1959), for the proposition that ‘[t]his [Cjourt has held that transactions to defeat creditors are viewed ... with disfavor and the statute therefore should receive a liberal construction.’ However, that case involved a conveyance of property by the debtor. A liberal construction of the fraudulent-transfer statute does not require a holding that the statute applies to transfers made by someone other than the debtor. Additionally, the Court of Civil Appeals has stated:
“ ‘Although the fraudulent conveyance statute is given a liberal construction, see Jesse P. Evans, Alabama Property Rights and Remedies, § 31.1, 470 (1994), and “[t]he manner or form of the transfer or conveyance is generally immaterial so long as the debtor, through a fraudulent device, puts his or her property beyond the ordinary reach of the creditor,” id. at § 31.2, 473, every conveyance that frustrates a creditor is not a fraudulent conveyance under the statute.’
“Aucoin v. Aucoin, 727 So.2d 824, 827 (Ala.Civ.App.1998). Even a liberal construction of the statute requires some demonstration that the debtor has put his property beyond the reach of a creditor.
“Holberg has cited no cases in which someone other than the debtor has been held liable under the fraudulent-transfer statute. Holberg simply argues that her claims should be valid under the statute because, she argues, Folmar was fraudulently transferring Cagle’s assets to Regina; Regina was acting on behalf of Cagle when she used the power of attorney to transfer his assets into her name; and Strojny was ‘concocting schemes for Regina to fraudulently put Cagle’s assets into her name.’ However, Hol-berg’s claims are missing one essential element for a cause of action pursuant to the Alabama Uniform Fraudulent Transfer Act: The transfer of property by the debtor.
“The purpose of the Alabama Uniform Fraudulent Transfer Act is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach. The plain language of the statute makes it applicable only to transfers ‘made by a debtor.’ In previous cases involving statutory interpretation, this Court has stated:
“ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’
“Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992))....
“We have found no case in which the provisions of the Alabama Uniform Fraudulent Transfer Act, §§ 8-9A-l to -12, have been extended to apply to *1043 transferors other than the debtor. Hol-berg argues that the defendants were in control of the debtor’s assets and, therefore, should be held liable. Hol-berg also argues that — because the judgment debtor is deceased, the defendants have rendered his estate insolvent, and the wife of the debtor is bankrupt — this Court should permit her to hold the defendants liable under the fraudulent-conveyance statute. Even if we accepted Holberg’s argument that Folmar and Strojny engaged in a conspiracy to defraud her, the Alabama Uniform Fraudulent Transfer Act, by its plain language, does not apply to claims against third-party transferors. Holberg’s claim under, that Act should have been asserted against the debtor (Cagle) or his estate. While there may be valid policy arguments for extending the Act to apply to transferors who are in control of the debtor’s assets, ‘it is not for the Judiciary to impose its view on the Legislature.’ Ex parte T.B., 698 So.2d 127, 130 (Ala.1997). Therefore, we conclude that the trial court erred in denying the defendants’ motions for a summary judgment on the fraudulent-conveyance claims. Our resolution of this issue makes it unnecessary to address the question whether a plaintiff can recover money damages pursuant to the Alabama Uniform Fraudulent Transfer Act, or whether remedies under that Act are limited to recovering the fraudulently transferred property.”
776 So.2d at 117-18.
In Thompson Properties, this Court held that the actual transferor, Eastern Valley Properties, was an alter ego of the debtor, and that the plaintiff could maintain an action under the AUFTA. The debtor, Ron Rockhill, the president and sole shareholder of Eastern Valley Properties, purchased a house, a condominium, and a vacant lot in the name of Eastern Valley Properties. Following this purchase, Rockhill lived in and used both the house and the condominium. Two years later, in 1990, Thompson Properties obtained a judgment against Rockhill for over $400,000. Rockhill filed a petition in bankruptcy. In May 1993, the bankruptcy court held that $113,760 of the $400,000 judgment was exempt from discharge in bankruptcy. Forty-two days later, Rock-hill, acting through Eastern Valley Properties, sold the house, the condominium, and the vacant lot to Birmingham Hide for $194,000. Rockhill used the $194,000 to settle other claims against him and Eastern Valley Properties. Rockhill continued to live in and use the house and the condominium, rent-free. In addition, when Birmingham Hide sold the house and the vacant lot, Birmingham Hide paid Rock-hill, rather than Eastern Valley Properties, a portion of the proceeds. The president of Birmingham Hide acknowledged that the payment'was for RockhiU’s “undocumented interest.”
Thompson Properties sued Birmingham Hide seeking to set aside Eastern Valley’s transfer of the condominium to Birmingham Hide. This Court held that the trans-feror, Eastern Valley, was in,fact the alter ego of Rockhill and that Rockhill was the actual transferor. This Court stated:
“It is undisputed that at the time the Eastern Valley Properties were transferred to Birmingham Hide, Rockhill was a debtor of the Partnerships [Thompson Properties], by virtue of the prior judgments in the Partnerships’ favor against Rockhill that the bankruptcy court had declared nondischargeable. Moreover, notwithstanding the trial court’s ruling — -which formed the basis of its summary judgment in favor of Birmingham Hide — that Eastern Valley was not, for purposes of the AUFTA, a debtor of the Partnerships when the *1044 transfer occurred, we conclude that Eastern Valley was, for purposes of the AUFTA, a ‘debtor’ at the time of the transfer, by virtue of the default judgment entered against Eastern Valley, in which the trial court declared that, at the time of the transfer, Eastern Valley was the alter ego and a mere instrumentality of Rockhill and that Eastern Valley was liable to the Partnerships for the judgments the bankruptcy court determined to be nondischargeable. The trial court certified the default judgment as final, and no party appealed the default judgment. Because of the trial court’s declaration that Eastern Valley was the alter ego and a mere instrumentality of Rockhill, it did not recognize Eastern Valley as an entity separate and apart from Rockhill. . See Southern Sash Sales & Supply Co. v. Wiley, 631 So.2d 968, 970 (Ala.1994); Forest Hill Corp. v. Latter & Blum, Inc., 249 Ala. 23, 28, 29 So.2d 298, 302 (1947). For purposes of the AUFTA, then, Eastern Valley and Rockhill could be considered ‘one and the same’ at the time of the transfer. Thus, the transfer of the Eastern Valley Properties to Birmingham Hide was a transfer ‘made by a debtor’ under the language of the AUFTA.
“Birmingham Hide argues that it is not bound by the trial court’s judgment declaring that Eastern Valley was the alter ego and a mere instrumentality of Rockhill at the time of the transfer. Consequently, Birmingham Hide says, Eastern Valley is not a ‘debtor’ for purposes of the Partnerships’ claims under the AUFTA. However, even absent the trial court’s declaration that Eastern Valley was the alter ego and a mere instrumentality of Rockhill, the Partnerships presented sufficient evidence to establish a genuine issue of material fact as to whether the transfer of the Eastern Valley Properties to Birmingham Hide was a transfer made by a debtor. For instance, the Partnerships presented evidence indicating that when the property was transferred to Birmingham Hide, Rockhill retained an ‘undocumented interest’ in the property, for which, pursuant to an agreement made at the time the property was conveyed to Birmingham Hide, Rockhill was paid by Birmingham Hide after the property was resold to bona fide purchasers. The deeds evidencing the conveyance to Birmingham Hide of the Eastern Valley Properties — in which Rockhill retained the ‘undocumented interest’ — were signed by Rockhill. If, as the evidence indicated, the transfer included Rock-hill’s undocumented interest, the transfer was one ‘made by a debtor.’ ”
839 So.2d at 633-34. See also Woodard v. Funderburk, 846 So.2d 363 (Ala.Civ.App.2002), where a father, Larry Funderburk, acting as his son’s attorney-in-fact, conveyed his son’s real property to Larry’s wife, Gina. The son died, and the mother of his child, Sabrina Woodard, sued Larry and Gina Funderburk, seeking to have the transfer set aside on the ground that she had a claim for unpaid child support. The Court of Civil Appeals, citing Holberg, held that even though Larry was his son’s attorney-in-fact for purposes of the transfer, he was not Sabrina’s debtor, and, therefore, there was no fraudulent transfer. S.J. Holding, in its reply brief, argues that “the Court of Civil Appeals has completely eviscerated the [AUFTA], effectively allowing a debtor to defraud his creditor as long as he uses an agent to put his assets beyond the reach of his creditors.” S.J. Holding asks this Court to reverse the holding in Woodard.[8]
*1045 S.J. Holding argues that the trial court erred in holding that the Meadowbrook property was not transferred by the debt- or, South Jefferson, and states, in part, the following:
“The undisputed evidence in the case conclusively establishes that the Mea-dowbrook property was transferred to Kadco by South Jefferson. Specifically, the evidence established that South Jefferson acquired the property in either 1985 or 1986 and was the sole owner of the property until it was sold to Kad-co.... Accord, Motion for Approval, of Sale and Transfer of Property of [EICA], ... (‘Comes now, Nelson Burnett, as Receiver of [EICA], ... and petitions this Court to approve the sale and transfer of certain real property currently owned by South Jefferson ... ’ (emphasis added.)).
“... The quitclaim deed conveying the Meadowbrook property to Kadco specifically identifies South Jefferson as the Grantor.... Although Burnett signed the quitclaim deed, he expressly did so on behalf of ‘South Jefferson Company, Inc.’ as ‘Its President.’ See id. Accord, Supplemental Affidavit of Nelson Burnett, ... (‘In my capacity as President of South Jefferson Company, Inc., I executed the quitclaim deed conveying the Meadowbrook property from South Jefferson to Kadco.’) Therefore the undisputed evidence in this case conclusively establishes that South Jefferson was the entity which transferred the Meadow-brook property to Kadco and that Burnett was involved in the transaction as South Jefferson’s corporate representative....”
(S.J. Holding’s brief, p. 20; citations omitted.) S.J. Holding further argues:
“Notwithstanding Kadco’s unsupported allegation to the contrary, there is no evidence that Burnett ‘was only president by virtue of his being the court-appointed receiver for EICA.’ There is certainly nothing in the liquidation order of the Receivership Court that even arguably supports that contention.... Rather, the undisputed evidence establishes that Burnett was [president of South Jefferson by virtue of the fact that he was ‘duly elected’ to that position.”
(S.J. Holding’s reply brief, p. 4; citations omitted.)
Kadco strongly relies on this Court’s holding in Holberg, supra, and the holding of the Court of Civil Appeals in Woodard. Kadco argues that the transferor is that person who controls the asset, not just the person who owns the asset. Kadco states:
“Even though Burnett sold the Mea-dowbrook property as president of South Jefferson, he was only president by virtue of his being the court-appointed receiver for EICA. Being a court-appointed receiver, Burnett did not seek to sell the property without the Court’s approval. The mere fact that he was the president of South Jefferson does not make the debtor the transferor....
“... [I]n this case, Burnett was serving as president of South Jefferson by virtue of his court-appointment as receiver. It was Burnett who sought court approval of the sale and authorized and directed the sale and transfer of the Meadowbrook property. Just as an attorney-in-fact is not a debtor, so also a court appointed receiver is not a debtor, since neither is hable on the debt.
“S.J. Holding emphasizes that it was not Burnett who actually transferred the *1046 property, but South Jefferson which did so. Technically, South Jefferson did transfer the property, since it held title to it. So also- — -technically—Larry Fun-derburk’s son [in Woodard v. Funderburk] transferred his property to his mother. However, this Court and the Court of Civil Appeals have focused on who controls the asset in determining the identity of the transferor.... In this case, Nelson Burnett, as receiver of the parent insurance company, controlled the asset. In his capacity as receiver, and for purposes of completing the liquidation of EICA, Burnett sought and obtained approval to sell an asset of South Jefferson. The transferor was, for purposes of the [AUFTA], Nelson Burnett, [as receiver for EICA], not South Jefferson.”
(Kadco’s brief, pp. 11-14; citations omitted.)
Based on the undisputed facts of this case, we believe that Kadco and the trial court have correctly interpreted Alabama law that delineates when and under what circumstances a person is a “debtor” within the meaning of the AUFTA. We conclude, therefore, that it was Burnett, acting as the receiver of EICA pursuant to a court order, who transferred the Meadow-brook property, not South Jefferson. The record clearly establishes that Burnett was appointed receiver of EICA in September 1992 and that he was ordered to “take immediate possession, custody and control of [EICA’s] property, both real and personal, ... including but not limited to ... all real estate, [and] stocks.... ”
It is clear in this case that Burnett filed a motion for court approval of the sale of the Meadowbrook property, as the receiver of EICA, and that the circuit court approved the sale of the Meadowbrook property by Burnett, as the receiver of EICA. Applying the rationale set out by this Court in Holberg, it seems clear that the grantor in this case was Burnett, acting as EICA’s receiver and not as South Jefferson’s alter ego; consequently, the trial court did not err in holding that the provisions of the AUFTA did not apply in this ease.[9] The judgment of the trial court, therefore, is affirmed.
This opinion was prepared by retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala.Code 1975.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.
HARWOOD, J., concurs in the result.

. Kadco’s counterclaim alleged that it had entered into contracts for the sale and development of certain portions of the real property that was the subject of the alleged fraudulent transfer and that S.J. Holding “brought this action maliciously and intentionally for the purpose of preventing [Kadco] from performing under and pursuant to the terms of those contracts.” Kadco also alleged that it had developed business relationships with "vendors, potential purchasers, builders, and other persons,” in connection with the devel *1037 opment of the property and that S.J. Holding brought this action “for the purpose of interfering with the business relationship between [Kadco] and such parties.” In addition Kad-co alleged that S.J. Holding had filed "a notice of the pendency of this lawsuit,” and that that notice "constitutes a cloud on the title of [Kadco] and prevents [Kadco] from being able to sell or otherwise utilize the property,” and that the notice was filed "maliciously and intentionally for the purpose of preventing [Kadco] from the proper utilization of the property." Kadco also alleged that S.J. Holding, “its agents, servants and employees, and others have conspired, connived, and contrived, to commit the acts and wrongs referred to in the preceding [counterclaims,” and that Kadco "is unable to sell any property ... that is the subject of this action.”

. The order of the court reads, in part, as follows:
"Nelson Burnett, as Chief of the Receivership Division of the Alabama Department of Insurance, ... under the provisions of Section 27-2-53 and Chapter 32 of Title 27, Code of Alabama 1975, be and is hereby appointed Receiver of all property, business, assets (general or other), affairs and estate of said Defendant EICA, and is directed to take immediate possession, custody and control of said property, both real and personal, ... including but not limited to ... evidence of debt and all other property and assets of every kind whatsoever belonging to EICA, including but not limited to, all real estate, stocks, bonds, ... and rights of action of any kind.
"Nelson Burnett, as Receiver of Defendant EICA, shall have authority to negotiate sales of property ... or other assets of Defendant EICA when necessary or desirable, but if he shall receive an offer for same, before making a private or public sale, Nelson Burnett, as Receiver, shall report the terms of such offer to the Court for such action or approval as the court may deem proper.”
Soon thereafter, the trial court ordered that EICA be liquidated pursuánt to the provisions of the Alabama Insurers Liquidation Act. In the liquidation order, the trial judge vested the receiver "with title to all property, assets, contracts and rights of action of EICA.” The order also directed the receiver to notify all creditors of EICA to present their claims against EICA by May 1, 1993.

. Baker was president of South Jefferson from 1983 to December 1992.

. EICA owned more than 90% of the stock of South Jefferson.

. The notice of the special shareholders’ meeting stated that the meeting would be held "at the principal office of the company, 514 South McDonough Street, Montgomery, Alabama 36104 on September 38[sic], 1995 at 9:30 a.m. C.S.T.” The resolution of the board of directors was dated September 28, 1995. The stated address, 514 South McDonough Street, Montgomery, Alabama 36104, was, at that time, the address of the State Department of Insurance, receivership division.

. We note that the letter is written on the stationery of the State Department of Insurance, receivership division, and that Nelson ■ Burnett is shown on the letterhead as being the chief of the receivership division.

. We note that both letters were addressed to Burnett at the 514 South McDonough Street, Montgomery, Alabama, address.

. No petition for a writ of certiorari was filed asking this Court to review the decision of the *1045 Court of Civil Appeals in Woodard; that court issued its certificate of judgment on October 18, 2002.

. The record clearly shows that EICA owned over 90% of South Jefferson, and that Baker, South Jefferson's long-time president, was no longer president upon Burnett’s election to that office in December 1992. The record also shows that all correspondence signed by Burnett as South Jefferson's president was written on State Department of Insurance, receivership division, stationery. The "corporate offices” of South Jefferson was located in the receivership division's office.