HARWOOD, Justice.
On January 12, 1999, Kay Allen Hart sued her ex-husband Donald A. Hart; Donald’s mother, Johnnie Ruth Brown; and Verlon J. Pugh. Kay’s complaint presented claims of fraudulent transfer of property and conspiracy to defraud. Brown and Pugh filed separate motions for a summary judgment, opposed by Kay, which the trial court granted.[1] Kay does not challenge the summary judgment in favor of Brown; thus, Brown is not a party to this appeal. Kay does appeal the summary judgment entered in favor of Pugh. She argues (1) that the trial court improperly relied on this Court’s decision in Folmar & Associates, LLP v. Holberg, 776 So.2d 112 (Ala.2000), to determine that the Alabama Fraudulent Transfers Act (“the Act”) does not apply to a transfer by an attorney in fact; (2) that the trial court should have allowed the full development of the facts in light of the “scant evidence” Pugh offered in support of his summary-judgment motion; and (3) that genuine issues of material fact exist as to whether the transfer of the real property Kay challenges was directed by Donald and whether Brown and Pugh knew of the “potential” judgment against Donald in Kay’s contempt proceeding.
Our review of a summary judgment is de novo.
“In reviewing the disposition of a motion for summary judgment, ‘we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,’ Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was ‘entitled to a judgment as a matter of law.’ Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule *1152 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).”
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
The record reveals the following facts. On December 19, 1992, several years before Donald and Kay married, Donald and Brown acquired lots 101 and 102 in Bear Point Estates in Orange Beach, Alabama (hereinafter referred to as “the Bear Point property”), as joint tenants with a right of survivorship. The purchase price of $38,989.31 was paid entirely by Brown’s husband and Donald’s stepfather, Clyde Brown, who is deceased.
On October 20, 1997, Donald and Kay were divorced by a judgment entered by the Mobile Circuit Court. Under the terms of the divorce judgment, Donald was obligated to make various monthly payments to Kay; among those were child support and mortgage payments on the marital residence. Donald was also required to execute “limited warranty deeds” to Kay conveying to her a one-half interest in real property located at 16501 Highway 9, Marlow, Alabama (hereinafter referred to as “the Fish River property”), as well as a one-half interest in real property located in Coden, Alabama, both of which were to be owned by Donald and Kay after the divorce as a joint tenancy with a right of survivorship. Donald was responsible for any indebtedness on those properties and for paying all taxes and insurance associated with them. Donald was to “retain, free and clear of any further claim or interest of [Kay] or her estate, all bank accounts, money market accounts, investment accounts, retirement accounts and real estate owned and maintained by [Donald] individually or jointly with his mother, except as otherwise provided herein.” The divorce judgment further stated: “All property received or retained by either party in this Agreement whether or not such property is specifically mentioned herein, shall be and remain the separate property of the party receiving or retaining that property and that property shall be free from any claim by the other or his estate.”
About three months after the divorce, on or about January 27, 1998, Donald sold the Fish River property in its entirety without Kay’s knowledge or consent, in violation of the divorce judgment. Also in violation of the divorce judgment, Donald failed to pay child support and to make mortgage payments on the marital home. On February 11, 1998, Donald executed a power of attorney in favor of Brown, which granted her the authority to, among other things, sell property owned by Donald. Specifically, pertinent provisions of the power of attorney state:
“It is my intention by this power of attorney to grant my attorney in fact the general power to do any act necessary to transact any business which I may be interested, as fully as I might do or *1153 could do if personally present, whether the specific power to do so has been enumerated in this Article or not. In no way am I intending to limit the general power to my power of attorney, but for the purposes of illustrating my attorney’s unlimited authority to act for me and in my behalf, I grant to my attorney the specific power to do the following acts described as follows:
[[Image here]]
“3. To retain, invest in, acquire by purchase, subscription, lease or otherwise, manage, sell at public or private sale, wholly or partly for cash or on credit, contract to purchase or sell, grant or exercise options to purchase, options to sell or conversion rights, assign, transfer, convey, deliver, endorse, exchange, pledge, mortgage, abandon, improve, repair, maintain, insure, lease for any term and otherwise deal with all property, and to release and waive any right of homestead therein, if any.”
Two days later, on February 13, 1998, Kay filed a motion seeking to hold Donald in contempt for failing to pay child support, failing to make the mortgage payments, and selling the Fish‘River property. On that same day, Brown, acting on her own behalf and on behalf of Donald pursuant to the authority granted to her by the power of attorney, deeded the Bear Point property to Pugh, reserving to herself a life estate in the property. She characterized Pugh in her later deposition testimony as her “real good friend.” The consideration stated in the deed was $10 and other good and valuable consideration. The total of the respective appraised values of the two lots constituting the Bear Point property, as shown by an appraisal by the Baldwin County revenue commissioner, was $80,400.[2] The deed conveying the Bear Point property to Pugh listed both Donald and Brown as the grantors. Brown signed tfie deed both on her own behalf and as Donald’s attorney in fact. The language contained under Brown’s signature as Donald’s attorney in fact stated, “Johnnie Ruth Brown, as Attorney in Fact for Donald A. Hart, acting under the terms of that Power of Attorney dated February 11, 1998.” Brown testified at her deposition that she conveyed the Bear Point property to Pugh in exchange for 10 acres of land in Robertsdale, Alabama, and $6,000. Brown testified that she and Donald had discussed selling the Bear Point property before she conveyed it to Pugh, as follows:
“A: ... We had already talked about — in one time [sic] Donald and I talked about selling him [Pugh] the house [the Bear Point property]. I asked him why he wanted to sell the house.
“Q: Asked who? [Donald]?
“A: Yes.
“Q: Okay.
“A: And he said something about it was a — kind of a sore thing with Kay because she wanted her name on that piece of property and that she wouldn’t go over there with him and help him to keep it up or anything. Well, anyway, we did not go through that then, but he was going to take the money out of that piece of property if I had signed it and pay off the note on their home.
“Q: But he didn’t do that?
“A: No, we didn’t do that then.”
It was not until April 14, 1998, that Pugh executed a deed for the 10 acres in *1154 Robertsdale, naming Brown as the only grantee. The appraised value of that property as of a May 22, 2000, appraisal report, was $28,000. Also, it was not until May 5, 1998, that Pugh issued a check f&r $6,000, payable to Brown. That check was never negotiated. Brown testified that she divested Donald of his interest in the Bear Point property because “it wasn’t his property until I died.” On May 18, 1998, Kay obtained a judgment in the amount of $15,111 in her contempt action against Donald, representing the child-support ar-rearage, past due mortgage payments, her one-half interest in the sale of the Fish River property, costs, and attorney fees. Subsequently, Kay filed the action underlying this appeal.
The trial court’s order granting Pugh’s motion for a summary judgment states, in pertinent part:
“Appearances were as noted in the record and, after hearing, the court finds as follows:
“1. This is an action brought pursuant to the Alabama Uniform Fraudulent Transfer Act, Code of Alabama (1975) § 8-9A-1 et seq.
“2. The plaintiff is the ex-wife of Donald A. Hart, who died during the pendency of this action. Johnnie Ruth Brown is the mother of Donald A. Hart.
“3. Johnnie Ruth Brown and Donald A. Hart acquired two lots in Baldwin County, Alabama (the Bear Point property), on December 19, 1992. Consideration for the property was paid by Ms. Brown’s deceased husband. The deed to Brown and Hart is a warranty deed with right of survivorship.
“4. Donald A. Hart and the plaintiff, Kay Allen Hart, were divorced on October 20, 1997. In paragraph 7(c) of the Judgment of Divorce, Donald Hart was awarded ‘free and clear of any further claim or interest of [Kay Allen Hart] or her estate in ... real estate owned and maintained by [Donald A. Hart] individually or jointly with his mother, except as otherwise provided herein.’ There was no other provision in the Judgment of Divorce regarding the Bear Point property.
“5. On February 11, 1998, Donald A. Hart executed a power of attorney to his mother, Johnnie Ruth Brown.
“6. Johnnie Ruth Brown conveyed her interest and her son’s interest in the Bear Point property to Verlon J. Pugh for the sum of $6000 and other valuable real property on February 13,1998.
“7. On February 13, 1998 Kay Allen Hart filed a motion for contempt against Donald A. Hart in the Domestic Relations Division of the Circuit Court of Mobile County, Alabama.

“Conclusions of Law

“Decision in this matter is controlled by the Alabama Supreme Court’s decision in Folmar & Associates LLP v. Holberg, 776 So.2d 112 (Ala.2000), wherein the Court held that the Alabama Uniform Fraudulent Transfer Act does not apply to claims against third-party transferors. The defendant Ver-Ion Pugh did not acquire any property from Donald A. Hart, the debtor. Rather, he acquired the Bear Point property from Johnnie Ruth Brown, a third-party transferor. The defendant is, therefore, entitled to judgment as a matter of law.”
Kay contends that the trial court erred in entering a summary judgment in favor of Pugh in reliance on Folmar & Associates, LLP v. Holberg, 776 So.2d 112 (Ala.2000), in light of the “manifest weight of evidence.” In Folmar, William Cagle and Pamela Holberg, husband and wife, divorced. Pursuant to a divorce judgment, Cagle was ordered to pay Holberg alimony *1155 in gross in monthly installments and to maintain a $100,000 life insurance policy naming Holberg as the beneficiary.
Cagle later married Regina Wrigley. Approximately two months later, on October 25, 1995, Cagle suffered a stroke, which caused him to lose the use of his arms and legs and, eventually, his ability to eat. Cagle was a partner ‘in a real-estate development firm, Folmar & Associates, LLP (“Folmar”). Even before his marriage to Holberg, Cagle had begun to take draws or cash advance loans from Folmar against his ownership interest in the partnership, which were to be repaid by deductions from Cagle’s interest in Fol-mar’s future earnings. By the time of his stroke, Cagle owed Folmar more than his interest in the partnership was worth, was otherwise significantly indebted, and had let the $100,000 life insurance policy lapse; after his stroke his financial advisors could not find another insurance company that would insure him. On January 22, 1996, he executed a durable power of attorney naming Regina as his attorney in fact.
As a result of his stroke, Cagle was generating extensive uninsured medical expenses. He and his wife met with Jimmy Folmar, one of the other two partners of Folmar; the attorney for the partnership; and the partnership’s certified public accountant. The Cagles also hired Michael Strojny, an agent of the Strojny Corporation, to serve as their financial adviser. Folmar then began advancing the Cagles $20,000 per month for their living expenses and additional sums for other purposes. In May 1997, Folmar reduced the monthly payment to $11,000; at that time Cagle stopped making alimony payments to Holberg. Cagle died in September 1997. Folmar recouped the advances it had made to the Cagles by offsetting them against Cagle’s future draws on his partnership interest. Cagle’s estate was declared insolvent. Holberg then sued Regina, Folmar, and the Strojny Corporation (“the defendants”), alleging intentional infliction of emotional distress, interference with a business relationship, fraudulent transfers, breach of fiduciary duty, self-dealing, and conspiracy. The defendants filed motions for a summary judgment, which the trial court denied except as to the claim of intentional infliction of emotional distress. This Court then granted Folmar and Strojny permission to appeal the trial court’s denial of the motions for a summary judgment as to the remaining claims, pursuant to Rule 5(a), Ala.R.App.P. Regina, who was bankrupt, did not seek appellate review of the denial of her motion for a summary judgment.
On appeal, addressing the fraudulent-transfer claim vis-a-vis Folmar and Stro-jny, this Court stated, in part:
“We have found no case in which the provisions of the Alabama Uniform Fraudulent Transfer Act, §§ 8-9A-l to -12, have been extended to apply to transferors other than the debtor. Hol-berg argues that the defendants were in control of the debtor’s assets and, therefore, should be held liable. Hol-berg also argues that — because the judgment debtor is deceased, the defendants have rendered his estate insolvent, and the wife of the debtor is bankrupt — this Court should permit her to hold the defendants liable under the fraudulent-conveyance statute. Even if we accepted Holberg’s argument that Folmar and Strojny engaged in a conspiracy to defraud her, the Aabama Uniform Fraudulent Transfer Act, by its plain language, does not apply to claims against third-party transferors. Holberg’s claim under that Act should have been asserted against the debtor (Cagle) or his estate. While there may be valid policy arguments for extending *1156 the Act to apply to transferors who are in control of the debtor’s assets, ‘it is not for the Judiciary to impose its view on the Legislature.’ Ex parte T.B., 698 So.2d 127, 130 (Ala.1997). Therefore, we conclude that the trial court erred in denying the defendants’ motions for a summary judgment on the fraudulent-conveyance claims. Our resolution of this issue makes it unnecessary to address the question whether a plaintiff can recover money damages pursuant to the Alabama Uniform Fraudulent Transfer Act, or whether remedies under that Act are limited to recovering the fraudulently transferred property.”
776 So.2d at 118.
Kay does not ask us to revisit, or in any other way reconsider, the expressed and implicit rationales of Folmar as they relate to the idea that a transfer of assets by the debtor’s attorney in fact is not a transfer by the debtor. Rather, in asserting that the trial court improperly relied on Fol-mar, she challenges that reliance only by attempting to distinguish the facts of that case. Specifically, she asserts:
“The facts in the case at bar are not based upon a simple power of attorney as in Folmar ..., but rather the present transaction is one directed by Donald Hart himself. Just two days prior to the transfer/deed, Donald Hart discussed the sale/transfer of his property with Ms. Brown to Verlon Pugh.... Mr. Hart discussed the transaction with Ms. Brown, executed the power of attorney in favor of Ms. Brown and, while still in town and ‘available,’ had Ms. Brown execute the deed to Verlon Pugh.”
(Kay’s brief, pp. 17-18.) In essence, Kay argues that because Donald directed the conveyance of the Bear Point property to Pugh, it was not a transfer by a third-party transferor, as she apparently accepts was the situation in Folmar,[3] In that regard, she states, “[t]hus, the property was not received from a third party trans-feror as in [Folmar\, but rather was received directly from Donald Hart (acting through Ms. Brown). Therefore, the case at bar is distinguishable from Folmar.”
In support of her contention, Kay cites pages 356-62 of the record, which cover a portion of Brown’s deposition testimony. Primarily, Kay relies on the excerpt quoted earlier as support for her contention that Donald and Brown discussed selling the Bear Point property to Pugh just two days before Brown conveyed it to him. In the statement of the case in her brief to this Court, Kay states that “in the present case, there were questions as to whether the transfer was done at the direction of Mr. Donald Hart.” In her summary of the argument, she asserts that Donald “had a conversation with [Brown] and the eventual transferee, Mr. Verlon Pugh, with regard to divesting his interest.” However, none of the testimony referenced by Kay supports those contentions.
The testimony she cites reveals that Donald and Brown did have a conversation regarding the sale of the Bear Point property to Pugh, but that no action to effectuate a sale was taken at that time. Neither those segments of Brown’s deposition tes *1157 timony nor any other portion of the record indicates that the conversation took place two days before the conveyance. In fact, there is no evidence to indicate when that conversation occurred. Furthermore, there is no support in the record for the assertion that Pugh himself was present when that conversation took place.
Kay further asserts that “other facts evidence [Donald’s] intent under [the Act].” (Kay’s brief, p. 19.) In support of her argument, Kay relies on Ala.Code 1975, § 8-9A-4, which provides, in pertinent part:
“(a) A transfer made by a debtor is fraudulent as to a creditor, whether the creditor’s claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.
“(b) In determining actual intent under subsection (a), consideration may be given, among other factors, to whether:
“(1) The transfer was to an insider;
“(2) The debtor retained possession or control of the property transferred after the transfer;
“(3) The transfer was disclosed or concealed;
“(4) Before the transfer was made the debtor had been sued or threatened with suit;
“(5) The transfer was of substantially all the debtor’s assets;
“(6) The debtor absconded;
“(7) The debtor removed or concealed assets;
“(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
“(9) The debtor was insolvent or became insolvent shortly after the transfer was made;
“(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
“(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.”
However, as stated earlier, Kay has not presented any evidence to show that Donald participated in Brown’s decision to transfer the Bear Point property to Pugh. Accordingly, we cannot conclude, as Kay urges us to do, that this case is distinguishable from Folmar because the evidence indicated that Donald directed his attorney in fact, Brown, to transfer the property. This is not to say that some of the attendant circumstances in the Brown-Pugh transaction do not raise an eyebrow, but, when we are asked to reverse a lower court’s ruling, we address only the issues and arguments the appellant chooses to present. Having done so in this case, we cannot hold that the trial court erred by entering a summary judgment for Pugh. Because Ala.Code 1975, § 8-9A-4, upon which Kay relies, applies only to the intent of the debtor, and because we have determined that there is no evidence in the record indicating that Donald, the debtor, directed or orchestrated the transfer of the Bear Point property to Pugh, which is Kay’s central contention, we need not address the remaining arguments Kay presents regarding the evidence presented by Pugh in his motion for a summary judgment.
For the foregoing reason, the judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, SEE, BROWN, and STUART, JJ., concur.

. Donald died before the trial court entered its summary judgment in favor of Brown and Pugh; however, the exact date of his death is not indicated in the record.

. Kay argues that the value of the Bear Point property was “at least” $95,100. In support of her contention, Kay states that Pugh received $70,000 for his interest in lot 101 when he subsequently sold it to another party and that the appraised value of lot 102 was $25,100, thus totaling $95,100.

. Folmar, as Pugh argues its holding, and as Kay apparently views that holding, involved, in certain respects, the alleged fraudulent transfer of property by a third party other than the debtor, in the person of the debtor’s attorney in fact. Kay argues that in the instant case, unlike Folmar, it was Donald, the debtor, who "directed” the conveyance of the Bear Point property to Pugh in an effort to prevent Kay from having it attached under the judgment in her contempt action. Thus, Kay argues, the two situations are distinguishable because Folmar involved the transfer of property by a third party whereas this case does not.