897 So.2d 248 (2004)
THOMPSON PROPERTIES 119 AA 370, LTD., and Thompson Properties 123 AA 370, Ltd.
v.
BIRMINGHAM HIDE AND TALLOW COMPANY, INC.
1021411.
Supreme Court of Alabama.
July 9, 2004.
Rehearing Denied September 17, 2004.
*250 David B. Anderson, N. Christian Glenos, and Ryan K. Cochran of Walston, Wells, Anderson & Bains, LLP, Birmingham, for appellants.
Eric J. Breithaupt, Richard E. Smith, Deborah Alley Smith, and Jessica K. Stetler of Christian & Small, LLP, Birmingham, for appellee.
HARWOOD, Justice.
On July 9, 1997, Thompson Properties 119 AA 370, Ltd., and Thompson Properties 123 AA 370, Ltd. (hereinafter "the Partnerships"), sued Birmingham Hide and Tallow Company, Inc. (hereinafter "Hide"), and Eastern Valley Trading Company (hereinafter "Eastern"), in the Jefferson Circuit Court. The Partnerships appeal *251 from a judgment in favor of Hide implementing a jury verdict. We affirm.
The Partnerships, as creditors of Eastern's sole shareholder and president, Ronald L. Rockhill, sought to have certain transfers of property set aside pursuant to the Alabama Uniform Fraudulent Transfer Act ("the AUFTA"), Ala.Code 1975, § 8-9A-1 et seq., on the theory that the properties had been transferred fraudulently. The Partnerships sought to obtain a judgment declaring that Eastern was the alter ego of Rockhill, that a conspiracy existed to defraud the Partnerships, as creditors of Rockhill, and that the transfer of certain assets from Eastern to Hide were fraudulent and in violation of the Partnerships' interests as creditors. The Partnerships sought compensatory damages, as measured by the value of the properties Eastern had transferred to Hide, and punitive damages; the Partnerships also sought to have constructive and equitable trusts imposed on their behalf on any property of Eastern that Hide still possessed as a result of Hide's transaction with Eastern and Rockhill.
On August 26, 1997, Hide answered the complaint and asserted as an affirmative defense that it was a bona fide purchaser for value of the property received from Eastern. Because Eastern did not answer the complaint, the trial court, on October 1, 1997, entered a default judgment against it; that judgment stated, in pertinent part:
"That at all times material to this action, Defendant [Eastern] was the alter ego and mere instrumentality of [Rockhill], and it is further,
"ORDERED, ADJUDGED, and DECREED that, [Eastern] is liable to Thompson Properties 119 AA 370, Ltd., for the full amount of its non-dischargeable judgment against [Rockhill] entered by the U.S. Bankruptcy Court for the Northern District of Alabama in Adversary Proceeding No 92-00130 in In re Ronald Loren Rockhill, Sr. (Case No. 91-09809-RCF-7) in the amount of $74,295.32, plus interest thereon at the statutory rate from the date of entry of said non-dischargeable judgment, and judgment is hereby entered of said non-dischargeable judgment, and judgment is hereby entered on behalf of Thompson Properties 119 AA 370, Ltd., and against [Eastern] in said amount; and it is further,
"ORDERED, ADJUDGED and DECREED that, [Eastern] is liable to Thompson Properties 123 AA 370, Ltd., for the full amount of its non-dischargeable judgment against [Rockhill] entered by the U.S. Bankruptcy Court for the Northern District of Alabama in Adversary Proceeding No. 92-00130 in In re Ronald Loren Rockhill, Sr. (Case No. 91-09809-RCF-7) in the amount of $39,465.19, plus interest thereon at the statutory rate from the date of entry of said non-dischargeable judgment, and judgment is hereby entered on behalf of Thompson Properties 123 AA 370, Ltd., and against [Eastern] in said amount...."
On October 6, 1999, the Partnerships filed a motion for a summary judgment on their claims against Hide; on October 28, 1999, Hide filed its opposition to the Partnerships' summary-judgment motion, arguing as follows:
"For a plaintiff to have a transfer set aside as fraudulent, there must be proof of three essential elements: (1) a creditor who was defrauded, (2) the debtor intended to defraud that creditor, and (3) the debtor conveyed property out of which the creditor could have realized his claim. Because [the Partnerships] in this case have failed to come forward with sufficient evidence to prove any of *252 these elements, there exist genuine issues of material fact which make a summary judgment improper."
On August 29, 2000, Hide amended its answer to add the affirmative defense that the money it gave Rockhill on the sale of the properties was a "gift."
On October 13, 2000, Hide filed what it labeled as a "renewed" motion for a summary judgment, arguing:
"A fraudulent transfer action must be pursued by a judgment creditor against its debtor. In this case, the [Partnerships'] judgment creditor [sic] was [Rockhill]. [Eastern] was the transferor, not [Rockhill]. The fact that [the Partnerships] contend that [Rockhill] and [Eastern] were alter egos of each other is immaterial, regardless of the truth of the matters asserted. As specifically announced by Folmar [& Assocs. LLP v. Holberg, 776 So.2d 112 (Ala.2000)], the fact that a judgment creditor may allege that assets were being controlled by another party is insufficient to prove a fraudulent transfer. The action lies only against assets actually conveyed by the judgment debtor. For this reason, summary judgment is due to be granted in favor of [Hide] on the ground that [Eastern], not [Rockhill,] was the transferor. The only claim held by [the Partnerships] at the time of the transfer in this case was against their Debtor, [Rockhill]."
On October 17, 2000, the trial court issued an order granting Hide's motion for a summary judgment on all counts asserted against it by the Partnerships, based on Folmar & Associates LLP v. Holberg, 776 So.2d 112 (Ala.2000), and dismissing the case with prejudice. The Partnerships appealed the summary judgment, and this Court reversed, stating, in pertinent part:
"The trial court incorrectly relied on Folmar & Associates LLP v. Holberg, 776 So.2d 112 (Ala.2000), in entering the summary judgment for [Hide]. As we have noted above, because the trial court determined that [Eastern] was the alter ego and a mere instrumentality of Rockhill when the Eastern Valley Properties were transferred to [Hide], the transfer was, for purposes of the AUFTA, `made by a debtor.' Therefore, the holding in Folmar does not control this case. Moreover, the transfers in Folmar involved loans to a debtor by a third party, not, as in the present case, a transfer of property by an entity that was the debtor's alter ego and was therefore legally the debtor. Thus, we hold that the trial court erred in granting [Hide's] summary-judgment motion."
Thompson Props. v. Birmingham Hide & Tallow Co., 839 So.2d 629, 634 (Ala.2002).
The case was tried before a jury. On January 31, 2003, the jury returned a verdict for Hide; the trial court subsequently entered a judgment on that verdict. The Partnerships filed a postjudgment motion for a judgment as a matter of law ("JML"), and a motion for a new trial. The Partnerships argued that they were entitled to a JML on their claims of fraudulent transfer based on the application of law to the undisputed facts; alternatively, they argued that they were entitled to a new trial because of alleged errors in the jury instructions and alleged juror misconduct. They submitted affidavits of jury members in support of the juror-misconduct claim. Hide filed an opposition to the motions and also moved to strike the affidavits of the jury members. On April 10, the trial court granted Hide's motion to strike the affidavits, and denied both postjudgment motions. It provided the following detailed analysis of its rationale for striking the affidavits:
"[The Partnerships], relying on affidavits secured from certain members of *253 the jury, argue to the Court that the nature of the juror misconduct consisted of the jury foreperson taking notes during the course of the Court's oral charge and recharge of the jury regarding the elements of proof necessary for [the Partnerships] to establish their case of liability against [Hide], and then reading those notes to her fellow members of the jury[,] causing them to cast their vote for [Hide].
"The Court, during the course of the trial[,] admonished the jury, according to APJI [Alabama Pattern Jury Instructions] 1.15 that it would permit jurors to take notes during the course of trial but that the notes were for the benefit of the note taker to be used as an aid to the note taker[']s memory and not to be shared with other members of the jury. The Court also instructed, consistent with APJI 1.15, that a juror's notes are not authoritative regarding their subject matter, and that if there were a conflict between the contents of a document introduced into evidence or testimony and the juror note, that the actual evidence was to be followed rather than the juror note.
"The charge of juror misconduct with regard to note taking, however, does not concern the note taker's recollection of the evidence, but her recollection of the Court's charge to the jury.
"....
"Regarding the new grounds stated of juror misconduct, the Alabama Rules of Evidence addresses this particular inquiry. Rule 606(b) [Inquiry into Validity of Verdict or Indictment] states that jurors are not competent witness [es] to offer testimony which would impeach their own verdict, except on the question of whether `extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.' [Hide's] motion to strike juror affidavits presented by [the Partnerships] and indeed [the Partnerships'] motion on these grounds rests on the issue of whether the jury's foreperson's notes constitute `extraneous prejudicial information.'
"Explaining the meaning of `extraneous prejudicial information', the Court in Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001), wrote:
"`This Court has stated:
"`"Generally, affidavits are inadmissible to impeach a jury's verdict. An affidavit showing that extraneous facts influenced the jury's deliberations is admissible; however, affidavits concerning `the debates and discussions of the case by the jury while deliberating thereon' do not fall with this exception."
"`HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 828 (Ala.1997). See also Ala. R. Evid. 606(b); this rule is substantially similar to Rule 606(b), Fed.R.Evid. In Peveto v. Sears, Roebuck & Co., 807 F.2d 486, 489 (5th Cir.1987), the United States Court of Appeals for the Fifth Circuit held that "by implementing Rule 606(b), Congress has made the policy decision that the social costs of such error are outweighed by the need for finality to litigation." The Seventh Circuit has held that Rule 606(b) is designed "to protect the judicial process from efforts to undermine verdicts by scrutinizing the jurors' thoughts and deliberations." United States v. Ford, 840 F.2d 460, 465 (7th Cir.1988). Other courts of appeals for the federal circuits have stated that Rule 606(b) promotes "free and uninhibited discourse during deliberations." Attridge v. Cencorp Div. of Dover Techs. Int'l, *254 Inc., 836 F.2d 113, 116 (2d Cir.1987); Maldonado v. Missouri Pac. Ry., 798 F.2d 764 (5th Cir.1986).
"`The plaintiffs misconceive the distinction, under Alabama law, between "extraneous facts," the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the "debates and discussions of the jury," which are protected from inquiry. This Court's cases provide examples of extraneous facts. This Court has determined that it is impermissible for jurors to define terms, particularly legal terms, by using a dictionary or encyclopedia. See Fulton v. Callahan, 621 So.2d 1235 (Ala.1993); Pearson v. Fomby, 688 So.2d 239 (Ala.1997). Another example of juror misconduct leading to the introduction of extraneous facts sufficient to impeach a jury verdict is an unauthorized visit by jurors to the scene of an automobile accident, Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala.1984), or to the scene of a crime, Dawson v. State, 710 So.2d 472 (Ala.1997).
"`The problem characteristic in each of these cases is the extraneous nature of the fact introduced to or considered by the jury. The improper matter someone argues the jury considered must have been obtained by the jury or introduced to it by some process outside the scope of the trial. Otherwise, matters that the jurors bring up in their deliberations are simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision. CSX Transp. v. Dansby, 659 So.2d 35 (Ala.1995). This Court has also noted that the debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts that would provide an exception to the general rule of exclusion of juror affidavits to impeach the verdict. Weekley v. Horn, 263 Ala. 364, 82 So.2d 341 (1955).
"`Nothing contained in the affidavits indicates the jury considered any extraneous facts. All the statements in the affidavits relate to evidence that was presented at trial or to information that was otherwise brought to the attention of the jury during the trial. The affidavits provide no evidence that the jury consulted any outside sources of information regarding the definition of "standard of care," or regarding any other matter. Nothing in either of the affidavits indicates that the jury, or any particular juror, was influenced by any outside source. The trial court did not abuse its discretion in denying the plaintiffs' posttrial motions seeking discovery regarding the jury's deliberations. HealthTrust, Inc. v. Cantrell, 689 So.2d 822 (Ala.1997).'
"(Emphasis added.) 798 So.2d at 652-53.
"Under the definition provided by the Supreme Court of extraneous material, a juror's notes taken of the Court's charge is not covered. Further, the APJI annotations to 1.15, the case of Hooks v. State, 45 Ala.App. 221, 228 So.2d 833 (Ala.Cr.App.1969) is cited. Hooks was a case where defendant was found guilty of first degree homicide and appealed the conviction. As part of the grounds for reversal, the Court stated the following:
"`One ground of the motion for a new trial was that a juror took notes during the trial and during the court's instructions to the jury.

*255 "`At the hearing on the motion the testimony tended to show that Ruth Floyd [took] shorthand notes of the testimony during the trial, but that she did not read her notes to other jurors in the jury room. The jury requested further instruction as to the four degrees of unlawful homicide and Mrs. Brown took notes of the court's instructions. After they had returned to the jury room she read aloud from her notes the judge's definition of the degrees of unlawful homicide.

"`In Denson v. Stanley, 17 Ala.App. 198, 84 So. 770 [(1918)], the court held that the taking of notes by a juror was not objectionable so long as it did not cause delay or undue consumption of time.
"`Furthermore, the verdict of a jury may not be impeached by the testimony of members of the panel as to things said and done in the jury room. Huddleston v. State, 37 Ala.App. 57, 64 So.3d [So.2d] 90 [(1952)]; Weatherspoon v. State, 34 Ala.App. 450, 40 So.2d 910 [(1949)]; Brackin v. State, 31 Ala.App. 228, 14 So.2d 383 [(1943)].'
"[45 Ala.App. at 223-24,] 228 So.2d at 836.
"There is established in the authority a clear line of distinction with regard to this issue. If the matter was a subject of debate and discussion between and among the jury and arose from the proceedings themselves, then individual jurors are not competent to offer testimony by affidavit or otherwise to impeach their own verdict. On the other hand, if the matter can be classified as extraneous prejudicial material, that is something brought to the attention of the jurors from outside the orderly process of the trial, such as from a textbook, a dictionary or the result of an independent investigation conducted by individual jurors the results of which are related to the panel and used as a basis for their verdict, then individual jurors are competent to offer testimony in order to impeach such a verdict.
"The opinion in Hooks indicates that a juror discussing her note taking of a jury charge with fellow members of the jury does not constitute extraneous prejudicial material such as to warrant the Court to set aside the jury's verdict or to declare a new trial of this matter."
On May 21, 2003, the Partnerships appealed, arguing that the trial court should have granted their summary-judgment motion or their motion for a JML or a new trial, contending as to the motion for a new trial that the jury's finding was contrary to the weight of the evidence based on certain provisions of the AUFTA, that the trial court erred when it denied the Partnerships' request for a more specific jury instruction, that the trial court erred when it failed to instruct the jury on a conspiracy count, and that the verdict was tainted by juror misconduct.
The Partnerships' complaint alleged that Rockhill "entered into a scheme to conceal and/or protect the assets of Rockhill held by [Eastern] from [his] creditors, including the Partnerships." From our review of the record, the facts most favorable to Hide, as we must view them under the applicable standard of review, are as follows: In 1974, Gary Thompson set up numerous limited partnerships; each partnership owned a piece of land and each partnership was named after Thompson. To denote the differences in each limited partnership, Thompson used a three-digit number after the words "Thompson Properties" as an identifier. The Partnerships are two of those entities. Thompson was the general partner of each of the limited partnerships until 1980 when he filed for *256 personal bankruptcy. In 1980, Rockhill, Thompson's cousin, became the general partner of each of the Thompson limited partnerships. In 1988, Rockhill created and incorporated Eastern. Enabled by his status as the general partner of the Thompson limited partnerships, Rockhill diverted approximately $316,000 from one of the partnerships, Thompson Partnerships 122 AA 056 ("TP122"), to Eastern, and he used the money to acquire three parcels of real estate in Eastern's name  a residence located in Shelby County; a condominium in Panama City Beach, Florida; and a vacant lot in Birmingham (collectively "the Property"). In 1989, Rockhill resigned as the general partner of the Thompson limited partnerships.
In 1988, TP122 sued Eastern and Rockhill in the Jefferson Circuit Court; it sought monetary and equitable relief. Thompson Properties 122 AA 056, Ltd. v. Ron Rockhill et al. (CV-88-501-575-JDC). In 1990, the Partnerships sued Rockhill, alleging breach of fiduciary duty and fraud. Because two plaintiffs were involved, a judgment was rendered against Rockhill for $250,359.32 and $177,801.19, respectively.
In 1991, TP122 settled its case with Rockhill. The pertinent terms of the settlement are as follows:
"This release pertains to and is in full settlement of all claims of [TP122], against [Rockhill and Eastern]....
"....
"Whereas, as part of the consideration for said compromise, [TP122] has agreed to dismiss with prejudice the lawsuit against [Rockhill and Eastern];
"....
"Now, therefore, in consideration of the sum of one hundred sixty-two thousand five hundred and no/100 dollars ($162,500.00), to be paid as hereinafter set forth, the sufficiency of which is hereby acknowledged by [TP122]....
"....
"[Rockhill and Eastern] shall pay the $162,500.00 within six (6) months of the date of this release. The said sum shall accrue interest at the rate of nine percent (9%) from the date hereof, with the exception that any sum paid within thirty (30) days of this agreement will not accrue interest. In the event [Rockhill and Eastern] have not paid the sum in full with accrued interest within six (6) months, [Rockhill and Eastern] agree that [TP122] shall have the authority to liquidate the [three properties acquired] in the name of [Rockhill and Eastern] which [they] have been restrained from disposing of by the Preliminary Injunction in this matter."
In 1991, Rockhill personally filed a petition in bankruptcy under Chapter 7 of the Bankruptcy Code, seeking to be discharged from all of his debts. Because title to the Property was in Eastern, it was not listed among Rockhill's personal assets, thereby allowing Rockhill's personal schedules of assets and liabilities to show a negative net worth. The Partnerships sought to have their 1990 judgment against Rockhill declared nondischargeable in the bankruptcy proceeding. In 1993, the bankruptcy court entered a judgment declaring that $74,295.32 and $39,465.19, respectively, of the Partnerships' judgment against Rockhill would be deemed nondischargeable. In the same year, in a further attempt to collect their judgments, the Partnerships garnished Rockhill's wages. However, the amounts collected did not cover the interest on the judgment, to say nothing of the principal, the end result being that Rockhill owed the Partnerships more than the original amount of the judgment the Partnerships had recovered.
*257 Rockhill failed to pay the amount due TP122 under the terms of the settlement agreement, and, pursuant to that agreement, TP122 attempted to sell all of the Property in one transaction. In 1993, Don Kilgore offered to purchase the Property for $192,000, and, after negotiation, TP122 accepted an offer of $194,000 for the Property. Because Rockhill had paid $316,000 for the Property, his assessment of the market value of the Property was higher, and he refused to allow Eastern to sign the deeds selling the Property for $194,000. Rockhill then contacted the owners of Hide, a company that primarily dealt in animal hide and tallow but that had also embarked on occasional real-estate ventures, about purchasing the Property. Rockhill informed Hide that because of the settlement with TP122, he had to find a buyer for the Property. Rockhill offered to sell the Property for $200,000. Hide rejected that offer and offered Rockhill $194,000, which Rockhill finally accepted. It is this transfer that is the basis of the Partnerships' action.
On July 6, 1993, an attorney for Hide wrote a letter to counsel for TP122 informing him that Hide would purchase the Property for $194,000. Eastern, through Rockhill, agreed to the sale.[1] Eastern, through Rockhill, executed the deeds to Hide for the Property. Although Rockhill "sold" Hide the residence located in Shelby County, Rockhill and Hide also entered into a lessor/lessee relationship as to that residence  Hide leased the residence to Rockhill for $1,462.50 per month on July 7, 1993. The lease also included the following provisions:
"Lessor agrees to offer to Lessee the subject property for sale to Lessee 24 hours prior to accepting any other offer on said property during the period of the Lease term; provided that Lessee is not in default under the terms of said Lease....
"In the event [Hide] sells subject property to [Rockhill] within one year of the date hereof, [Hide] agrees to pay [Rockhill], as agent, a commission in the amount of the net gain, after income tax and all costs incurred."
Owen Vickers, a co-owner of Hide, testified that any and all agreements between Hide and Rockhill relating to the terms of the lease were contained in the lease itself. Testimony from Vickers also revealed that Rockhill paid the rent for five months and then continued to live in the residence for an additional 21 months, without paying rent. Vickers testified that Hide allowed Rockhill and his family to remain in the residence for a number of reasons; two of those reasons, Vickers said, were that because of the garnishment of his wages by the Partnerships, Rockhill was not able to pay the rent and that the Rockhills were making improvements to the residence. Vickers also stated that in his experience with real estate, it is easier to sell a "lived-in" residence as opposed to one that has been unoccupied for a significant period.
During 1994 and 1995, Hide sold the various parcels constituting the Property and, by virtue of those sales, received approximately $492,000. According to Vickers's testimony, after the Property was sold, Rockhill asked Vickers for a $40,000 loan because Rockhill was concerned about where he and his family would reside now that the residence had been sold. Vickers stated that he did not think Hide owed Rockhill anything as a result of the sale of the residence because the residence had not been sold within a year of the signing *258 of the lease agreement. Yet, as "standard operating procedure," whenever a request was made for the payment of money from Hide, Vickers discussed the request with Harry Vickers, his uncle and a co-owner of Hide. The nature of that conversation was described at trial as follows:
"Q [Counsel for Hide]: Okay. And at some point later, did [Rockhill] come talk to you about wanting to get some money? Did [Rockhill] come and talk to you and ask you for some money?
"A [Owen Vickers]: He did. But, actually, I think it's a few months before the house is sold, because we had a contract on the house and then we closed on [a] later date.
"Q: Okay. So he was asking for money during this time period?
"A: That's correct.
"Q: Did you talk it over with your Uncle Harry?
"A: I did.
"Q: Now your Uncle Harry  you're no youngster, but your Uncle Harry's a good bit older than you, isn't he?
"A: Yeah, he's 87  be 87 this weekend, I think.
"Q: And do you respect and honor your uncle in terms of what he's done for the business? "A: Just like my father.
"Q: All right. So when [Rockhill] came and talked to you and said, pay me some money, I want some money, was it kind of standard operating procedure on a decision like that you go talk to your Uncle Harry?
"A: I did.
"Q: What did your Uncle Harry have to say about it?
"A: He said, it looks like it's going to be a good deal. Why don't we just go ahead and give him some money? And I said, well, none of the terms of the agreement we had with him had been met. He didn't sell the house and sure, he's put some things around there to help it sell, but I didn't feel like we actually owed him anything.
"Q: All right. You said none of the terms had been fulfilled. Were you talking about that paragraph D on Page 6 of the lease?
"A: Everything hadn't been relieved.
"Q: Home didn't sell within one year?
"A: No.
"Q: And since it didn't sell within one year, did you feel like that you were obligated to give him anything?
"A: No.
"Q: Did you tell your Uncle Harry that?
"A: I did. "Q: Did your Uncle Harry have a different idea?
"A: He did.
"Q: Did you defer to your Uncle Harry's wishes on it?
"A: I did. But I told him I was going to take off  when we found out  when we sold the house, I think we got to closing or a week before closing, they called me and there were some library dues he hadn't paid three years prior. So we had to pay those. They were about $350, I think."
The check Hide gave to Rockhill was in the amount of $39,650, and, during a pretrial deposition, Vickers characterized the payment as, among other things, an "undocumented interest," which, the Partnerships say, gives the appearance that the check was the product of a secret negotiation between Hide and Rockhill. However, when asked about that check during trial, Vickers responded as follows:
"Q [Counsel for Hide]: Owen, was there a secret deal made at the time you *259 purchased the properties back in July of 1993? Was there a secret agreement that you were always going to give [Rockhill] some money, no matter what happened?
"A [Owen Vickers]: No.
"Q: There was a deal that was reflected in the lease though, wasn't there? Home didn't sell within a year though, did it?
"A: No.
"Q: And did you believe that because that condition had not been met, that you weren't obligated to pay him any money?
"A: That's correct.
"Q: Now yesterday [opposing counsel] flashed several things from your deposition up on the screen and I'm not mechanically smart enough to know how to do that, but I want to ask you some questions about you[r] deposition. I'm talking about the deposition that was taken before this lawsuit was ever filed. Did the lawyers for [the Partnerships] contact you and tell you they wanted to take your deposition?
"A: Yes.
"Q: Did you know anything about a lawsuit at that time?
"A: No, I did not.
"Q: Did you contact your attorneys and say, hey, I need some help here. They're taking my deposition. I've got something I'm worried about?
"A: No, sir. I went without an attorney and I never even called [another counsel] or you or anybody.
"Q: All right. Did you go and voluntarily answer the questions?
"A: Voluntarily answered everything they asked me.
"Q: All right. They made some time issue about the fact that you talked about an undocumented interest that was paid to Rockhill. Did you place any special significance on that term, `undocumented interest'? "A: No, sir.
"Q: Why did you use that term?
"A: For no better reason of commission, whatever.
"Q: You didn't know really what to call it?
"A: Right."
When asked about the check on cross-examination, the following took place:
"Q [Counsel for Rockhill]: Okay. So in response to his request for a gift, the check was given to [Rockhill]?
"A [Owen Vickers]: He felt like if he  all the things had been done that were in the original deal, that he would have gotten some money. And we gave him some money. That's basically what happened.
"....
"Q: Okay. So my question, again, is: If you decided to make a gift, why did you direct employees of [Hide] to run all these calculations, analyzing it as a borrower/creditor transaction, as a landlord/tenant transaction, as a loan transaction?
"A: I was probably trying to show my uncle that we didn't owe him anything, if the truth was known, by showing that he owed us $47,000 in rent on that one. And I documented on this about  of all the expenses that we had on the house.
"Q: And the expenses on the house were charged to [Rockhill]? "A: No.
"Q: Were they deducted from the amount of the gift?
"A: No.
"Q: Has [Hide] ever made any gifts like this to anyone else?

*260 "A: We've made gifts every year to charities.
"Q: Okay.
"A: We've sponsored children at the Cornerstone School.
"Q: Okay.
"A: I could go on and on.
"Q: But we are clear that [Rockhill] did ask to be paid some money, correct?
"A: That's correct.
"Q: And he actually wanted a lot more than $39,000, didn't he?
"A: He sure did. He wanted anything he could get. He was desperate.
"....
"Q: And in 1995 in your deposition without your lawyers, you did state that [Rockhill] had an undocumented interest?
"A: For no better word to use than an undocumented interest or commission or whatever."
On redirect examination, the following was revealed:
"Q [Counsel for Hide]: All right. Second thing is this: [Opposing counsel] said, have you ever made any other gifts like this one made to Rockhill? Did you have other tenants that you let stay in properties that you owned without paying the rent?
"A [Owen Vickers]: Yes, sir.
"Q: Do you have a tenant right now  and I don't want you to name him and I don't want you to talk about any of the money that is owed  but do you have a tenant right now that has been in a piece of property for some period of time, that you have not kicked him out?
"A: Well, we just did. He's 12 months behind on his rent. And another one is four months behind.
"Q: All right. You told me earlier it's just not your practice, though, to just automatically run and kick somebody out of their property?
"A: That's right."
Regarding Hide's payment to him, Rockhill testified that he thought that the check should have been made out to his wife for maintaining and improving the residence, including landscaping, sodding, and tree removal performed during the years the Rockhills occupied the residence.
This Court's standard for reviewing a ruling on a motion for a JML is well-settled.
"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
*261 Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala.1999).
Additionally, this Court reviews the grant or denial of a motion for a new trial under the standard set out in Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160, 162-63, (Ala.1988):
"[W]hen the evidence meets the `sufficiency' test, jury verdicts are presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new trial. Therefore, a judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial, will not be reversed on a weight-of-the-evidence ground unless it is `plainly and palpably' wrong. Ashbee v. Brock, 510 So.2d 214 (Ala.1987). See, also, Jawad v. Granade, 497 So.2d 471 (Ala.1986)."

I. The AUFTA
The Partnerships assert that the first reason they are entitled to a JML is that the conveyance of the Property to Hide was conclusively fraudulent as a matter of law under the AUFTA. Section 8-9A-4(a), Ala.Code 1975, a part of the AUFTA, states:
"A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."
The Partnerships argue that the undisputed evidence conclusively demonstrates that Rockhill fraudulently transferred the Property to Hide. The Partnerships argue that Rockhill, the debtor, possessed an actual intent to defraud them as creditors when he agreed to sell the Property to Hide. Rockhill's actual intent, the Partnerships argue, is evident when his actions are viewed against the "badges of fraud" listed in § 8-9A-4(b), which, the Partnerships say, provides guidance for determining the actual intent to defraud. That section provides:
"In determining actual intent under subsection (a), consideration may be given, among other factors, to whether:
"....
"(2) The debtor retained possession or control of the property transferred after the transfer;
"(3) The transfer was disclosed or concealed.
"(4) Before the transfer was made the debtor had been sued or threatened with suit;
"(5) The transfer was of substantially all the debtor's assets;
"....
"(7) The debtor removed or concealed assets;
"....
"(9) The debtor was insolvent or became insolvent shortly after the transfer was made...."
The Partnerships contend that Rockhill's actions fit those elements of § 8-9A-4(a) and that their claim is therefore strengthened by the indicia of intent in § 8-9A-4(b). The Partnerships also contend that under Alabama common law a conveyance of property coupled with a reservation of interest in the conveyed property is conclusively fraudulent, regardless of intent. The evidence presented does show that Rockhill retained an interest in the conveyed property: he entered into a lessee/lessor relationship with Hide; he had a right of first refusal with respect to the residence for a period and was to receive a commission if the residence was sold within an allotted time. The Partnerships cite a number of cases that, they say, stand for the proposition *262 that reservation of a benefit in conveyed property is conclusively fraudulent. See Sims v. Gaines, 64 Ala. 392 (1879); Morton Hardware Co. v. Barranco, 233 Ala. 346, 172 So. 109, 110-11 (1937); Bryant v. Young, 21 Ala. 264 (1852); Steiner v. Scholze, 114 Ala. 88, 21 So. 428 (1897); Campbell v. Davis, 85 Ala. 56, 4 So. 140 (1888); Hartshorn v. Williams, 31 Ala. 149 (1857); Deposit Bank of Frankfort v. Caffee, 135 Ala. 208, 33 So. 152 (1902); and Williams v. Ellington, 233 Ala. 638, 172 So. 903 (1936).
However, as Hide notes, those cases predate the AUFTA, which has an effective date of January 1, 1990. Hide argues that the enactment of the AUFTA supersedes the common law and that the language of § 8-9A-4(a) indicates that the Partnerships must prove that Rockhill had the intent to defraud before the transfers to Hide can be set aside. Hide also relies on this Court's treatment of a land conveyance in trust in Giles v. Ingrum, 583 So.2d 1287 (Ala.1991), in which this Court stated that, "under the [AUFTA], evidence of the donor's fraudulent intent or of constructive fraud is required in order to void a trust. Section 8-9A-4." 583 So.2d at 1288.[2] Hide analogizes that rationale to the instant case to say that although the Partnerships have stated facts that show Rockhill's conduct matched some of the qualifications listed in § 8-9A-4, Hide has presented evidence to the contrary, and that § 8-9A-4(b) begins by stating that "consideration may be given." (Emphasis added.) This phrasing, argues Hide, indicates that the list of factors in § 8-9A-4(b) is not intended to be exhaustive and that § 8-9A-4(b) does not purport to state that if one or more of the elements are shown, actual intent to defraud must be presumed.
While the Partnerships did present evidence linking Rockhill to certain of the factors in § 8-9A-4(b), that evidence was not undisputed or unexplained. Rockhill remained at the residence not as an owner, but as a lessee. Hence, a jury could view Rockhill's "possession or control" of the residence as only a present possessory interest subject to the terms of the lease, and not an interest that allowed Rockhill to retain any ownership rights. Owen Vickers testified that every oral agreement between Rockhill and Hide concerning Rockhill's lease was reduced to writing, negating the inference that the "transfer was ... concealed." Vickers further testified that there was never any secret deal between Rockhill and Hide resulting in Hide's paying Rockhill any money. Therefore, the Partnerships fail to present undisputed evidence that the transfer of the Property was conclusively fraudulent under § 8-9A-4(a) based on Rockhill's actual intent to defraud the Partnerships.
Alternatively, the Partnerships argue that they are entitled to a JML under § 8-9A-5(a), a part of the AUFTA. That Code section provides:
"A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer."
The Partnerships contend that the undisputed facts of the case satisfy every element of § 8-9A-5(a). Again, however, there is evidence that negates certain of those elements.
*263 Concerning the concept of "reasonably equivalent value," the trial court charged the jury as follows:
"Now, the definition also includes the term `reasonably equivalent value' and that term has been used by the attorneys, and I want to give you a definition. What it means is this: It means a value that is in the ballpark or reasonably close to the market value, and I'll define what market value is. The market value is the price which it might be expected to bring if offered for sale in a fair market. A price which would be fixed by negotiation and final agreement after ample time to find a purchaser as pertained to a vendor and a purchaser[,] but is not compelled to take the particular piece of property at a particular point in final. Whether the price paid was reasonably equivalent or reasonably close to the market value at the time of the transfer is for you all to decide from all the evidence."
(Emphasis supplied.) We note that because the Partnerships did not object to the trial court's charge to the jury regarding the definition of "reasonably equivalent value" in § 8-9A-5(a), that charge is the law of the case. "Unchallenged jury instructions become the law of the case." BIC Corp. v. Bean, 669 So.2d 840, 844 (Ala.1995).
Evidence was presented to the jury indicating that when Rockhill purchased the Property in 1988, he paid approximately $316,000 for it. In 1993, the Property was sold to Hide for $194,000. Vickers testified that upon his inspection of one of the properties, he found that significant repairs were needed for the Property to be marketable and that there were also unpaid taxes on the Property. Also, Rockhill informed Hide of the TP122 settlement that involved the Property in the possibility of further litigation.
We find it noteworthy that although the Partnerships claim that $194,000 was not a reasonably equivalent value for the Property, that amount was not arbitrarily set by Hide. When Rockhill first approached Hide, he told Owen Vickers that Kilgore, a third party contacted by TP122, initially agreed to purchase the Property for $194,000, and that the only reason the deal was not consummated was because Rockhill was reluctant to accept Kilgore's offer. It was not until Rockhill was unsuccessful in developing a higher offer that he contacted Hide. These were all things considered by Hide when it submitted its offer of $194,000, and were also facts that a reasonably functioning jury could weigh in determining that $194,000 was "in the ballpark or reasonably close to the market value."

II. Motion for a New Trial
The Partnerships ask this Court to overturn the trial court's denial of their motion for a new trial. First, the Partnerships contend that the jury's verdict is plainly against the weight of the evidence. In its brief to this Court, the Partnership contends that a reasonable jury could not have found:
"(a) that [Hide] paid a `reasonably equivalent value' for the [Eastern] properties.
"(b) that Rockhill did not reserve an interest in the [Eastern] properties.
"(c) that Rockhill did not have actual intent to defraud the Partnerships based upon the numerous other undisputed badges of fraud."
However, because Hide presented evidence to rebut the Partnerships' claim that the transfer was fraudulent, the jury had a foundation for its finding. Owen Vickers testified that based on his research into the worth of the Property and also on the fact that Rockhill had been offered *264 $194,000 for the Property initially, he believed that $194,000 was a reasonably equivalent value for the three properties in 1993. This point has been fully developed in Part I.
Also discussed previously, the badges of fraud the Partnerships claim are indicative of Rockhill's actual intent to defraud were not undisputed or unexplained. Hide presented evidence the jury could use to negate the inference that Rockhill had the actual intent to defraud the Partnerships. Because there was sufficient evidence presented from which the jury could conclude that the amount Hide paid for the Property was a reasonably equivalent value and that Rockhill did not have an actual intent to defraud, the jury's verdict was not plainly against the weight of the evidence, and the trial court's denial of the Partnerships' motion for a new trial was not improper on that basis.
The Partnerships next argue that they are entitled to a new trial because, they say, the jury's verdict was the product of juror misconduct. Before the jurors began their deliberations, the court charged them as follows:
"The one thing I cannot do is `Can you give us a copy of what you're reading off of,' well, you can't do that. You just have to rely on your memory. I know a lot of you have taken notes, and that just shows you're an attentive juror. What my charge was to you earlier, you're [sic] note taking is for your own benefit and recollection of the testimony. If there's a document that says something other than your note, the document is your evidence[,] not the note. The note's not to be passed around to everybody. It's for your own personal use."
The Partnerships argue, based on affidavits of jurors, that the foreperson, a court reporter by profession, read her notes to the jury during its deliberation in contravention of the trial court's charge. Also, the Partnerships say, when the foreperson read her notes, she effectively and erroneously changed the Partnerships' burden of proof.
We first note that the trial court correctly struck the juror affidavits filed by the Partnerships with their motion for a new trial. This Court has stated:
"Generally, affidavits are inadmissible to impeach a jury's verdict. An affidavit showing that extraneous facts influenced the jury's deliberations is admissible; however, affidavits concerning `the debates and discussions of the case by the jury while deliberating thereon' do not fall with this exception."
HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 828 (Ala.1997) (citations omitted; emphasis added). Rule 606, Ala. R. Evid., states:
"(b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying *265 in support of a verdict or indictment."
The crux of the Partnerships' argument concerning the foreperson's action is that reading notes that were contrary to the actual charge was tantamount to the improper introduction of extraneous facts. This Court dealt with this issue in Sharrief v. Gerlach, 798 So.2d 646, 652-53 (Ala.2001), stating, in pertinent part:
"The plaintiffs misconceive the distinction, under Alabama law, between `extraneous facts,' the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the `debates and discussions of the jury,' which are protected from inquiry. This Court's cases provide examples of extraneous facts. This Court has determined that it is impermissible for jurors to define terms, particularly legal terms, by using a dictionary or encyclopedia. See Fulton v. Callahan, 621 So.2d 1235 (Ala.1993); Pearson v. Fomby, 688 So.2d 239 (Ala.1997). Another example of juror misconduct leading to the introduction of extraneous facts sufficient to impeach a jury verdict is an unauthorized visit by jurors to the scene of an automobile accident, Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala.1984), or to the scene of a crime, Dawson v. State, 710 So.2d 472 (Ala.1997).
"The problem characteristic in each of these cases is the extraneous nature of the fact introduced to or considered by the jury. The improper matter someone argues the jury considered must have been obtained by the jury or introduced to it by some process outside the scope of the trial. Otherwise, matters that the jurors bring up in their deliberations are simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision. CSX Transp. v. Dansby, 659 So.2d 35 (Ala.1995). This Court has also noted that the debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts that would provide an exception to the general rule of exclusion of juror affidavits to impeach the verdict. Weekley v. Horn, 263 Ala. 364, 82 So.2d 341 (1955)."
The rationale from Gerlach is applicable in this case. Assuming that the foreperson was inaccurate in her recollection of the trial court's charge, that charge was given as a part of the trial. The foreperson's notes, a reflection of her recollection of the trial court's charge, were made within the scope of the trial. This is not the case where a dictionary or some other knowledge gained outside the evidentiary scope of the trial was introduced to the jury during its deliberation. See Ex parte Arthur, 835 So.2d 981 (Ala.2002) (juror brought in a medical textbook to find information on possible causes of migraine headaches), and Dawson v. State, 710 So.2d 472 (Ala.1997) (juror reported results of an unauthorized visit to the crime scene). Even if the foreperson erroneously stated the trial court's charge, her notes cannot constitute "extraneous evidence." The charge to the jury was an innate part of the trial proceeding, and to the extent some jurors relied on the foreperson's notes instead of their own memory, that process was part of the "debates and discussions" of the jury. Cantrell, 689 So.2d at 828. Because we conclude that a juror's reading to other jurors notes taken by him or her during trial does not amount to "extraneous facts," we do not reach the issue whether the Partnerships suffered actual prejudice by the reading of the notes in this case. Thus, the trial court did not err in denying the Partnerships' motion for a new trial based on juror misconduct.
*266 The Partnerships next argue that they are entitled to a new trial because, they argue, the trial court erred in refusing to charge the jury on conspiracy.
"It is a basic tenet of Alabama law that `a party is entitled to have his theory of the case made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court's failure to give those instructions is reversible error.'"
Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 384 (Ala.1993) (quoting Alabama Farm Bureau Mut. Ins. Serv., Inc. v. Jericho Plantation, Inc., 481 So.2d 343, 344 (Ala.1985)). After the charge was given to the jury, the Partnerships objected to the court's failure to give Alabama Pattern Jury Instructions ("APJI") 43.00, 43.01, and 43.02.
Charge 43.00 reads as follows:
"CIVIL CONSPIRACY  DEFINITION
"A civil conspiracy is a combination of two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means.
"The essence of the action in civil conspiracy is the wrong committed rather than the conspiracy itself."
Charge 43.01 reads as follows:
"CIVIL CONSPIRACY  EVIDENTIARY PROOF REQUIRED
"Because of the clandestine nature of a conspiracy, proof that a conspiracy existed may be proved by inference and circumstantial evidence concerning the character of the acts done, the relation of the parties and other facts and circumstances suggestive of a concerted action."
Charge 43.02 reads as follows:
"CIVIL CONSPIRACY  PROFIT OF EACH DEFENDANT NEED NOT BE SHOWN
"Any defendant who participates in a civil conspiracy is liable for the damages sustained by the plaintiff as a result of the conspiracy, regardless of whether the defendant profited from the conspiracy."
Hide argues that the Partnerships failed to provide sufficient evidence showing that Hide defrauded the Partnerships. The Partnerships allege that they presented evidence of an oral agreement between Rockhill and Hide, which they say shows that Rockhill possessed an "undocumented interest" in the Property, the results of which, they allege in their brief to this Court, were as follows:
"1. Rockhill lived in the house and used the Condo he `sold.'
"2. No rent was paid under a written lease of the house.
"3. Calculations of `interest' and `profits' were made [on the sale of the Property].
"4. [Hide's] counsel represented Rockhill (seller) and [Hide] (purchaser) in the same transaction and documented and referred to agreements regarding profit sharing.
"5. [Hide] paid for the defense of [Eastern] on the alter ego claim."
In regard to allegations 1 through 3, evidence was presented showing that Rockhill never "used" the condominium. Instead, Rockhill's wife made one weekend trip to the condominium, the sole purpose of which was to remove the family's belongings from the condominium. Also, Rockhill paid rent on the residence under the terms of the lease agreement, just not for the entire time he and his family lived in the residence. Vickers testified that there were other reasons Rockhill was allowed to remain in the residence even though he ceased paying rent, none of *267 which had to do with Rockhill's having an "undocumented interest." Finally, Vickers testified that the "calculations of interest and profits" were done only in an effort to show his uncle that Hide did not owe Rockhill any money. Further, we are bound by Rule 45, Ala. R.App. P., which states:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Based on our examination of the case, the omission of the conspiracy charges could not have "injuriously affected substantial rights of the parties." The evidence relied on by the Partnerships relates to the claim that the Property was fraudulently transferred, a claim the jury rejected. There was no evidence presented, nor was it ever pleaded, that Hide itself defrauded the Partnerships. "The essence of the action in civil conspiracy is the wrong committed rather than the conspiracy itself." APJI § 43.00. See also McLemore v. Ford Motor Co., 628 So.2d 548, 550-51 (Ala.1993):
"We next look to the plaintiff's allegations of civil conspiracy to defraud. `Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed. Louisville & N.R. Co. v. National Park Bank, 188 Ala. 109, 65 So. 1003 [(1914)]; Humphrey v. Terry, 206 Ala. 249, 89 So. 607 [(1921)].' O'Dell v. State ex rel. Patterson, 270 Ala. 236, 240, 117 So.2d 164, 168 (1959). A civil conspiracy requires a combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means. Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251 (1953); Eidson v. Olin Corp., 527 So.2d 1283, 1285 (Ala.1988).
"We have carefully studied the record, and we conclude that the trial judge properly entered the summary judgment for the defendants as to the plaintiff's civil conspiracy claim, because she presented no evidence of [fraud]. Because the underlying cause of action is not viable, the conspiracy claim must also fail. Allied Supply Co. v. Brown, 585 So.2d 33, 36 (Ala.1991)."
The next reason the Partnerships argue that they are entitled to a new trial is because, they say, the trial court should have more clearly instructed the jury that there existed alternate theories of recovery, and, because the trial court failed to do so, a verdict for the defense was rendered as a result of juror confusion. The trial court initially charged the jury on every element pertinent to the proceedings. After some deliberation, the jury requested to hear various parts of the charge again and the judge obliged, again discussing the separate claims. In sum, the trial court fully and accurately charged the jury on the two theories of recovery based on the applicable provisions and elements of the AUFTA. The Partnerships' "objection" voiced to the trial court was simply as follows:
"[Counsel for the Partnerships]: You know, Judge, I'm just trying to think what it might be they're confused about. Maybe they don't understand that these *268 are alternate theories. And they are alternate theories.
"[The Court]: There are two different theories. They can pick one or they can pick the other.
"[Counsel for the Partnerships]: I think you ought to tell them it's alternate theories.
"....
"[The Court]: They didn't ask that question, so I don't think I ought to go out there and answer it for them. It may not be what they're wondering about, and we can't speculate on that."
This exchange did not properly constitute an objection meeting the requirements of Rule 51, Ala. R. Civ. P.; therefore, even if the trial court erred in the premises, which we do not perceive, any such error was not preserved for this Court's review.
Finally, the Partnerships argue that if this Court were to find that none of the listed alleged errors, taken individually, mandates a new trial, then their cumulative effect necessitates a new trial. While true that the oft-cited case, Bekins Van Lines v. Beal, 418 So.2d 81 (Ala.1982), allows for this possibility, the record must plainly demonstrate error. After our review of the record and consideration of the errors the Partnerships alleges occurred, we find that the trial court did not exceed its discretion when it denied all of the Partnerships' postjudgment motions and its motion for a new trial. The judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, BROWN, and STUART, JJ., concur.
JOHNSTONE, J., concurs in the rationale in part and concurs in the result.
JOHNSTONE, Justice (concurring in the rationale in part and concurring in the result).
But for one exception, I concur in the main opinion. The exception is that I respectfully disagree with the main opinion in its rationale that the plaintiff Partnerships did not sufficiently preserve their objection to the refusal of the trial court to supplement its jury instructions by further instructing the jury that the plaintiffs' two theories were in the alternative to each other. The colloquy quoted in the main opinion shows not only that the plaintiffs precisely identified their objection but also that the trial court understood the objection and even made an express adverse ruling. In my opinion, the reason the trial court did not err in refusing the supplemental instruction is that the posture of the case, including the stage of the proceedings, the content of the entirety of the instructions already given, and the content of the request of the jury for further instructions, did not require the further instruction requested by the plaintiffs.
NOTES
[1] After Rockhill's agreement, Kilgore, on July 23, 1993, sent TP122 a letter in which he increased his offer to $210,000. The record does not reveal whether this offer was ever communicated to Rockhill.
[2] Because the conveyances in Giles took place before the enactment of the AUFTA, the Court analyzed the case under now repealed § 8-9-7.